803 A.2d 512

MARYLAND ENVIRONMENTAL TRUST

v.

Cathy Cook GAYNOR, et ux.

No. 108, Sept. Term 2001.

Court of Appeals of Maryland.

July 19, 2002.

Andrew H. Baida, Solicitor General, Baltimore, (J. Joseph Curran, Jr., Atty. Gen., Joseph P. Gill, Asst. Atty. Gen., all on brief), for petitioner.

Paul F. Strain (Mitchell Y. Mirviss of Venable, Baetjer and Howard, LLP, on brief), Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

RAKER, J.

This case involves a conservation easement[1] upon property donated to petitioner, the Maryland Environmental Trust (MET), pursuant to Maryland Code (1974, 1996 Repl.Vol., 2001 Supp.) § 2–118 of the Real Property Article. Respondents Cathy Cook Gaynor and Kevin Gaynor initiated this action in the Circuit Court for Anne Arundel County, claiming that MET unlawfully induced them into granting a conservation easement on their land by not disclosing that MET would have accepted the easement without also requiring them to surrender their right to subdivide their property. We shall hold that respondents failed to produce clear and convincing evidence that MET committed fraud in inducing them to

---

1. A conservation easement is a legal agreement between a landowner and MET that restricts the potential uses of the land at issue in order to prevent it from being developed for commercial or industrial uses or for housing developments. See Maryland Code (1974, 1996 Repl.Vol., 2001 Supp.) § 2–118 of the Real Property Article. In exchange for creating a conservation easement, a landowner qualifies for certain property, income, and estate tax benefits.

donate the easement at issue in this case. Accordingly, we shall reverse the judgments of the Court of Special Appeals, *Environmental Trust v. Gaynor,* 140 Md.App. 433, 780 A.2d 1193 (2001), and the Circuit Court rescinding their Deed of Conservation Easement.

## I.

MET is a public agency governed by a Board of Trustees and operating as part of the Department of Natural Resources. *See* Maryland Code (1973, 2000 Repl.Vol., 2001 Supp.) § 3–202 of the Natural Resources Article.[2] MET was created in 1974 to "conserve, improve, stimulate, and perpetuate the aesthetic, natural, health and welfare, scenic, and cultural qualities of the environment, including, but not limited to land, water, air, wildlife, scenic qualities, open spaces, buildings or any interest therein, and other appurtenances pertaining in any way to the State." § 3–201(a). MET is empowered to "acquire and hold real and personal property, or any interest therein, of aesthetic, scenic, or cultural significance . . . by lease, gift, purchase, devise, bequest, or by any other means, and conserve, improve, administer, invest, or dispose of the properties for the purposes of the Trust. . . ." § 3–203(3). MET's purpose "is of general benefit to the citizens of this State, and is charitable in nature," by protecting property for the benefit of the public at large thereby preserving the natural environment and preventing sprawl development. § 3–210(a). One way that MET accomplishes its purpose is by accepting donated conservation easements. By accepting the easement, the State undertakes to enforce the restriction in perpetuity.

In 1989, respondents[3] contacted MET to inquire about donating a conservation easement on their twenty-five acre

---

**2.** Unless otherwise indicated, all subsequent statutory references are to Maryland Code (1973, 2000 Repl.Vol., 2001 Supp.), Natural Resources Article.

**3.** Respondent Kevin Gaynor is an attorney, described by the Court of Special Appeals as one with substantial experience in environmental

property. They were informed that MET normally accepts easements on property of fifty acres or larger. Thereafter, respondents contacted several of their neighbors about donating easements simultaneously so that the aggregate acreage of the properties · donated would qualify them for conservation easements. Several neighbors expressed interest in donating conservation easements to MET.

In June 1989, representatives of MET met with respondents and their neighbors. Negotiations between the parties occurred throughout the summer of 1989. Although respondents and their neighbors explored donating conservation easements simultaneously, individual easements were required for each property, and the terms of each of those easements varied.

On September 11, 1989, the properties were presented to MET's Board of Trustees. The minutes of that board meeting state as follows:

"The Board voted to accept the easements, subject to the following conditions:

(1) The donors proposed dispute resolution language should be modified . . .;

(2) The deeds must contain a clause to state that MET may unilaterally make the 501(c) local land trust a co-grantee . . .;

(3) Staff should *ask* for a "no subdivision" provision in the Servary deed, and also in the Gaynor and Schumacher deeds. This is most important for the Servary deed. However, the Board will accept the easements without this provision if necessary. . . ."

Respondent Kevin Gaynor testified at trial that he spoke to James Highsaw, MET's designated representative, by telephone on September 12, 1989, that Mr. Highsaw told him about the board meeting, and that he got the impression from the conversation that MET would not accept the easements

matters. *See Environmental Trust v Gaynor,* 140 Md.App. at 437, 780 A.2d at 1195.

unless the property owners agreed to the subdivision restriction. He testified that Mr. Highsaw told him that the Board of Trustees "wanted" the restriction and "felt strongly" about it. He assumed that this meant that the Board required the restriction as a condition of accepting the easements.

On September 15, 1989, Mr. Highsaw sent a letter to respondent Kevin Gaynor stating as follows:

"Dear Kevin:

As I discussed with Barbara Parker this week, our Board of Trustees agreed to accept the easement offers on the condition that the proposed dispute resolution language be changed to read *discuss the matter for 30 days* instead of *discuss referring the matter to arbitration.* The Board also advised that the deeds should contain a provision stating that MET may unilaterally make the 501(c) local land trust a co-grantee of the easements. I will have to get the exact wording to you after further discussion with a Board member.

The Board requests that the owners consider adding a 'no subdivision' provision to the Gaynor, Schumacker/Parker, and Servary deeds to ensure that the properties remain intact under one ownership. Because of its smaller size, the Board especially recommends this provision for the Servary property. With such a provision, the second home site on each property could not be subdivided off and sold to a new owner as a separate lot. Please report this to each property owner, and discuss this request at your September 18th meeting and get back to me.

I will proceed with asking the Board of Public Works to ratify the easements at their October 4th meeting. In the meantime, I will need your response to the 'no subdivision' provision."

According to respondents, Mr. Highsaw never stated specifically that MET's Board of Trustees would accept the easements without the subdivision restriction. Mr. Highsaw testified that he had no independent recollection of his telephone conversations with respondents in 1989, but that he drafted

the minutes of the September 11, 1989 meeting of MET's Board of Trustees because that was one of his duties as the staff person in attendance. Mr. Highsaw also testified that he believed that he told respondents and the other property owners that MET's Board of Trustees had accepted their easements without the no-subdivision provision and that this information was conveyed in his September 15, 1989 letter.

One of the other property owners, Barbara Parker, testified at trial as to her understanding of Mr. Highsaw's September 15, 1989 letter. She testified that it was clear that the request for a subdivision restriction was not a requirement and that she was certain that she informed respondents and the other property owners that she and her husband would not agree to a no-subdivision provision. No such subdivision restriction was included in the conservation easement that the Schumacher/Parker family donated to MET.

In December 1997, respondents learned that their neighbors, Dale Schumacher and Barbara Parker, intended to build a second home on part of their property and that their conservation easement to MET did not include a subdivision restriction.

On February 11, 2000, respondents filed a First Amended Complaint in the Circuit Court for Anne Arundel County against MET, seeking declaratory judgment for *ultra vires* action and raising claims of fraud in the inducement, negligent misrepresentation, and deceit, concealment, and nondisclosure.

A court trial was held on March 15, 2000 in the Circuit Court for Anne Arundel County. At the close of respondents' case, MET moved for judgment on all counts. The court granted judgment in favor of MET on the claim for declaratory judgment for *ultra vires* action. In a written memorandum opinion and order, the Circuit Court found in favor of respondents on their claim for fraud and ordered rescission of the Deed of Conservation Easement, as well as all other written and oral agreements between the parties underlying the conservation easement. The Circuit Court entered judgment for

MET on the claims for negligent misrepresentation and deceit, concealment, and nondisclosure.

MET noted a timely appeal to the Court of Special Appeals, and respondents noted a timely cross-appeal. The intermediate appellate court held that the trial court did not err in finding that MET was fraudulent in its communications with respondents and, as a result of that holding, did not address the issues raised in respondents cross-appeals'. *Environmental Trust v. Gaynor*, 140 Md.App. 433, 780 A.2d 1193 (2001). The majority of the panel held that the "legal conclusion that a false statement was made is supported by the undisputed fact that Mr. Highsaw affirmatively represented to Mr. Gaynor that he would send him an outline of the board's actions." *Id.* at 442, 780 A.2d at 1198. The court based its conclusion on its finding that Mr. Highsaw's letter to respondents "gave the impression of being a complete overview of the Board's decision when, in fact, it concealed the truth of the Board's actual decision." *Id.* at 442, 780 A.2d at 1198. The court concluded that the failure to state expressly that the no-subdivision provision was optional had the effect of defrauding respondents. *See id.* at 443, 780 A.2d at 1198.

Judge Deborah S. Eyler dissented, noting that the letter sent to Mr. Gaynor fully and accurately conveyed the precise decision made by the Board at the meeting. *See id.* at 444–45, 780 A.2d at 1199 (Eyler, J., dissenting). Judge Eyler concluded that no fraud had occurred because "[t]here is nothing whatsoever in the language of the letter to suggest that the owners had to agree to the 'no subdivision' provision in their deeds, or the easements would not be accepted." *Id.* at 444, 780 A.2d at 1199.

We granted MET's petition for writ of certiorari to determine whether the courts below improperly determined that MET committed fraud in obtaining the conservation easement from respondents "when the State made no misrepresentation to acquire the donation but rather issued a letter that the trier-of-fact in this case found was 'ambiguous' with respect to

a proposed restriction on the donation." *Environmental Trust v. Gaynor,* 367 Md. 88, 785 A.2d 1291 (2001).

## II.

In order to recover in a tort action for fraud or deceit, a plaintiff must show, by clear and convincing evidence: " '(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.' " *VF Corp. v. Wrexham Aviation,* 350 Md. 693, 703, 715 A.2d 188, 192–93 (1998) (quoting *Nails v. S & R,* 334 Md. 398, 415, 639 A.2d 660, 668 (1994)). Except in a few special types of transactions not implicated in this case, Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party. *See Fegeas v. Sherrill,* 218 Md. 472, 476, 147 A.2d 223, 225 (1958).

While it is not necessary to produce proof of wrongful conduct in order to succeed in establishing constructive fraud that justifies the rescission of a contract, a plaintiff still must show the "breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Ellerin v. Fairfax Savings,* 337 Md. 216, 236 n. 11, 652 A.2d 1117, 1126 n. 11 (1995) (citations omitted).

The facts established at trial in this case were legally insufficient to support a finding, by clear and convincing evidence, that MET made to respondents a misleading or false representation of fact constituting fraud. The minutes of the meeting of MET's Board of Trustees reflect that the Board voted to accept respondents' easement subject to two conditions not involved in the present controversy (regarding dis-

pute resolution language and the local land trust) and that the Board intended that its representative seek a no-subdivision provision. Viewed in the light most favorable to respondents, Mr. Gaynor's testimony regarding the communications from MET's representative, Mr. Highsaw, subsequent to the meeting of the MET Board (namely, that he got the impression from Mr. Highsaw's telephone call after the meeting that the subdivision restrictions were mandatory) was not sufficient, as a matter of law, to constitute fraud. This is hardly sufficient evidence of the misleading statement required for a claim of fraudulent inducement, particularly in light of Mr. Gaynor's admission at trial that Mr. Highsaw's words had been to the effect that the Board "wanted" the restriction and "felt strongly" about it.

Furthermore, the letter that Mr. Highsaw sent to respondents made clear, by its plain language, that MET was requesting that respondents and the other property owners "*consider*" adding a 'no subdivision' provision" to their deeds (emphasis added). Mr. Highsaw's letter specifically employed the verbs "request," "consider," and "recommend" in conveying the Board's position on the subdivision issue. There was nothing whatsoever in the language of the letter to suggest that respondents had to agree to include a subdivision restriction in their deeds as a requirement of MET's acceptance thereof. This is particularly apparent when the language regarding MET's request for a subdivision restriction is viewed alongside the contrasting language requiring the other two mandatory provisions. The letter closed by informing respondents that Mr. Highsaw would be asking the Board of Public Works to ratify the easements and that he would need a response to the no-subdivision provision before doing so. Mr. Highsaw's letter did not ask for a response with respect to the proposed dispute resolution and local land trust provisions because those provisions, unlike the subdivision restriction, were mandatory.

■ Failure to state more explicitly that MET would accept the conservation easement without a subdivision restriction

was not sufficient, by itself, to constitute fraud, as MET had no duty to do so. There was no fiduciary or confidential relationship existing between respondents and MET that would have required such a disclosure in order to avoid any breach of trust. *See Gingell v. Backus,* 246 Md. 83, 92, 227 A.2d 349, 353 (1967). The letter from Mr. Highsaw to respondents truthfully and accurately conveyed the decision made by the Board of Trustees at the meeting and concealed nothing from respondents, who admitted at trial that Mr. Highsaw never stated to them that the no-subdivision restriction was required. Therefore, as a matter of law, respondents failed to produce proof amounting to clear and convincing evidence that MET committed fraud.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR ENTRY OF JUDGMENT CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.*