Nancy Lee Kathryn Thompson, et al. v. UBS Financial Services, Inc., et al., No. 76, September Term, 2014

**CONVERSION OF INTANGIBLE PROPERTY – STARE DECISIS – CONSTRUCTIVE FRAUD – CONFIDENTIAL RELATIONSHIP –** (I) Court of Appeals reaffirmed Allied Inv. Corp. v. Jasen, 354 Md. 547, 731 A.2d 957 (1999), and again held that defendant does not convert plaintiff's intangible property where defendant does not convert document that embodies plaintiff's right to plaintiff's intangible property; and (II) Court of Appeals held that, here, plaintiffs failed to establish claim for constructive fraud, as plaintiffs failed to establish that parties were in confidential relationship.

Circuit Court for Baltimore City
Case No. 24-C-08-005476

Argued: April 9, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 76

September Term, 2014

_____

NANCY LEE KATHRYN THOMPSON, ET
AL.

v.

UBS FINANCIAL SERVICES, INC., ET AL.

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Watts, J.
Barbera, C.J., Adkins and McDonald, JJ.,
concur

_____

Filed: May 22, 2015

A defendant converts a plaintiff's personal property where the defendant intentionally exerts "ownership or dominion over [the plaintiff]'s personal property in denial of or inconsistent with the [plaintiff]'s right to [the plaintiff's personal] property." Nickens v. Mount Vernon Realty Grp., LLC, 429 Md. 53, 77, 54 A.3d 742, 756 (2012) (citations omitted). In Allied Inv. Corp. v. Jasen, 354 Md. 547, 562, 731 A.2d 957, 965 (1999), this Court unanimously held that a defendant does not convert a plaintiff's intangible property where the defendant does not convert a document that embodies the plaintiff's right to the plaintiff's intangible property; in other words, under Jasen, id. at 562, 731 A.2d at 965, one element of conversion of a plaintiff's intangible property is conversion of a document that embodies the plaintiff's right to the plaintiff's intangible property.

In this case, we decide: (I) whether to overrule Jasen, id. at 562, 731 A.2d at 965, and hold that a defendant can convert a plaintiff's intangible property even where the defendant does not convert a document that embodies the plaintiff's right to the plaintiff's intangible property; and (II) whether, here, the plaintiffs established a claim for constructive fraud.

(I) We reaffirm Jasen, id. at 562, 731 A.2d at 965, and again hold that a defendant does not convert a plaintiff's intangible property where the defendant does not convert a document that embodies the plaintiff's right to the plaintiff's intangible property; and (II) we hold that, here, the plaintiffs failed to establish a claim for constructive fraud, as the plaintiffs failed to establish that the parties were in a confidential relationship.

## BACKGROUND

In the Circuit Court for Baltimore City ("the circuit court"), Nancy Lee Kathryn Thompson ("Kathy"), Barbara Ann Clements (together, "Petitioners"), and Karen Lee Kirlin ("Karen"), "for the benefit of" Susan Witherspoon ("Susan"), Carol Lareuse ("Carol"), and the Estate of Albert E. Thompson, III ("Albert"),[1] sued Susan's husband, Gordon H. Witherspoon ("Witherspoon"), Respondent; The Manufacturers Life Insurance Company; John Hancock Life Insurance Company USA; and UBS Financial Services, Inc., UBS Financial Services Insurance Agency, Inc., and UBS Insurance Agency, Inc. (together, "UBS") for multiple causes of action, including conversion and constructive fraud as to Witherspoon.[2]

Gradually, the number of parties dwindled. No lawyer entered an appearance on behalf of Albert's estate. Susan filed a motion to strike herself and Carol as parties, which the circuit court granted. Petitioners and Karen filed a stipulation of dismissal of their claims against The Manufacturers Life Insurance Company and John Hancock Life Insurance Company USA. Karen filed a stipulation of dismissal of her claims against Witherspoon and UBS. Thus, by the time of trial, Petitioners, Witherspoon, and UBS were the only parties.

At trial, the circuit court admitted evidence of the following facts, which we

---

[1]Albert died in 1998.

[2]Witherspoon and UBS filed motions to compel arbitration, which the circuit court granted. Petitioners and Karen appealed, and the Court of Special Appeals reversed and remanded, holding that the circuit court erred in granting the motions to compel arbitration. See Thompson v. Witherspoon, 197 Md. App. 69, 91, 74, 12 A.3d 685, 698, 688 (2011).

summarize.  Albert E. Thompson, Jr. and Nancy Schenuit Thompson (together, "the Thompson Parents") were the parents of Petitioners, Karen, Susan, Carol, and Albert (together, "the Thompson Children").  The Thompson Children purchased a life insurance policy as to which they were the owners and beneficiaries, the Thompson Parents were the insureds, and Witherspoon was the broker.  The Thompson Children signed the application for the life insurance policy, which listed Witherspoon's address under "Send Premium Notices To:"; from 1990 through 1998, the life insurance company mailed all policy-related documents to Witherspoon's address.

Each year from 1990 through 1995, the Thompson Parents paid each of the Thompson Children the amount of his or her share ($17,500) of the annual life insurance premium ($105,000.01).  Because Kathy disliked Witherspoon, the Thompson Parents paid Kathy's share directly to her, and Kathy transferred her share directly to the life insurance company.  The Thompson Parents deposited the shares of the rest of the Thompson Children into their respective accounts with UBS, where Witherspoon worked as a financial advisor from 1995 through 2005; the shares were then automatically transferred to the life insurance company.

Each year from 1996 through 2003 (except for 1997), the Thompson Parents did not pay each of the Thompson Children the amount of his or her share of the annual life insurance premium.  Thus, in each of those seven years, the life insurance company automatically issued a loan to the Thompson Children from the life insurance policy's cash value to cover the amount of the unpaid annual life insurance premium.  The loans' principal totaled $735,000.07, and the interest on the loans totaled $165,457.12 as of

October 2007; thus, in all, the life insurance company deducted $900,457.19 from the life insurance policy's cash value. The Thompson Children never consented to the loans, which could have been avoided by paying the annual life insurance premium, surrendering the life insurance policy for its cash value less any policy debt, or continuing the life insurance policy as "paid-up" life insurance, for which the premium would have been the life insurance policy's cash value less any policy debt. The life insurance company mailed to Witherspoon policy statements and policy notices that mentioned the loans. Witherspoon knew about the loans, but never told Petitioners about them.

Around the years in which the Thompson Parents did not pay each of the Thompson Children the amount of his or her share of the annual life insurance premium, the Thompson Parents provided Witherspoon and Susan (together, "the Witherspoons") with various gifts and loans. In 1995, the Thompson Parents began paying approximately $18,000 each year for the school tuition of one of the Witherspoons' children. In 1995, the Thompson Parents loaned the Witherspoons $89,000. Each year from approximately 1995 through 2003, the Thompson Parents gifted $20,000 to the Witherspoons. Sometime after 1995, the Thompson Parents began paying approximately $18,000 each year for the school tuition of another one of the Witherspoons' children. In 2004, the Thompson parents loaned the Witherspoons $585,000.

At the conclusion of the trial, a jury found Witherspoon liable for negligence, negligent misrepresentation, deceit, conversion, and constructive fraud, and found UBS liable for negligent supervision. Witherspoon and UBS separately moved for judgment notwithstanding the verdict; Witherspoon contended that Petitioners failed to establish a

claim for conversion or constructive fraud. The circuit court denied the motions for judgment notwithstanding the verdict. Witherspoon and UBS appealed, and the Court of Special Appeals reversed and remanded, holding that Petitioners failed to establish claims for conversion and constructive fraud, and that the trial court made other errors that necessitated a new trial as to the claims other than conversion and constructive fraud. See UBS Fin. Servs., Inc. v. Thompson, 217 Md. App. 500, 536, 507, 94 A.3d 176, 197, 180 (2014). Petitioners filed a petition for a writ of *certiorari*, which this Court granted only as to the issues regarding conversion and constructive fraud.[3] See Thompson v. UBS Fin. Servs., 440 Md. 225, 101 A.3d 1063 (2014).

Later, Petitioners filed in this Court a notice of dismissal of their claims against UBS; thus, Witherspoon is now the only Respondent. Nonetheless, because this case was docketed in this Court under the name Thompson v. UBS Fin. Servs., this case will retain that name for this opinion's purposes.

**DISCUSSION**

**I.**

Petitioners contend that the circuit court was correct in denying Witherspoon's motion for judgment notwithstanding the verdict as to conversion, as Petitioners established a claim against Witherspoon for conversion of the life insurance policy. Specifically, Petitioners argue that Witherspoon converted the life insurance policy by interfering with Petitioners' right to the life insurance policy, even if Witherspoon did not

---

[3]Witherspoon filed a protective cross-petition for a writ of *certiorari*, which this Court denied.

convert a document that embodied Petitioners' right to the life insurance policy. More broadly, Petitioners assert that a defendant converts a plaintiff's intangible property by interfering with the plaintiff's right to the plaintiff's intangible property, even if the defendant does not convert a document that embodies the plaintiff's right to the plaintiff's intangible property. Accordingly, Petitioners urge us to overrule Jasen, 354 Md. at 562, 731 A.2d at 965, in which this Court expressly declined to adopt Restatement (Second) of Torts § 242(2) (1965) ("One who effectively prevents the exercise of intangible [property] rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted."). Petitioners assert that Jasen, 354 Md. at 562, 731 A.2d at 965, is archaic in light of the modern increase in digital media (as opposed to paper documents).

Witherspoon responds that the circuit court erred in denying his motion for judgment notwithstanding the verdict as to conversion, as Petitioners failed to establish a claim against him for conversion of the life insurance policy. Specifically, Witherspoon contends that, because he did not convert a document that embodied Petitioners' right to the life insurance policy, he did not convert the life insurance policy. More broadly, Witherspoon argues that a defendant does not convert a plaintiff's intangible property where the defendant does not convert a document that embodies the plaintiff's right to the plaintiff's intangible property. Witherspoon asserts that Jasen, 354 Md. at 562, 731 A.2d at 965, is not archaic because, for conversion's purposes, the document that embodies the plaintiff's right to the plaintiff's intangible property can be either paper or digital.

An appellate court reviews without deference a trial court's denial of a motion for judgment notwithstanding the verdict, "while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party[.]" Scapa Dryer Fabrics, Inc. v. Saville, 418 Md. 496, 503, 16 A.3d 159, 163 (2011) (citation omitted).

Conversion evolved from trover, which occurred where a defendant, a "finder of lost goods[,] . . . refused to return them" to the plaintiff, the owner of the goods. Lawson v. Commonwealth Land Title Ins. Co., 69 Md. App. 476, 480, 518 A.2d 174, 175-76 (1986). Originally, because a plaintiff's intangible property could not be lost or found, a defendant could convert only a plaintiff's tangible personal property, see id. at 480, 518 A.2d at 176; now, however, a defendant can convert a plaintiff's intangible property under certain circumstances. See Jasen, 354 Md. at 560, 731 A.2d at 963 ("[C]ertain intangible property interests may now be recovered through a conversion claim."). Specifically, a defendant converts a plaintiff's intangible property where the defendant converts a document that embodies the plaintiff's right to the plaintiff's intangible property. See id. at 562, 731 A.2d at 965 ("[C]onversion generally may extend to the type of intangible property rights that are merged or incorporated into a transferable document."). For example, such a document could be a stock certificate, see id. at 563, 731 A.2d at 965, a promissory note, see Thomson v. Gortner, 73 Md. 474, 478, 21 A. 371, 372 (1891), or a document that embodies the right to a life insurance policy, see Durst v. Durst, 225 Md. 175, 180, 169 A.2d 755, 757 (1961).

In Jasen, this Court held that a defendant does not convert a plaintiff's intangible

- 7 -

property where: (1) no document embodies the plaintiff's right to the plaintiff's intangible property; or (2) a document embodies the plaintiff's right to the plaintiff's intangible property, but the defendant does not convert the document. See 354 Md. at 562, 731 A.2d at 965 ("We refuse . . . to extend [conversion] to cover completely intangible [property] rights[,] or[,] as [Restatement (Second) of Torts § 242(2)] contemplates, . . . situations in which the relevant document itself has not been transferred.").[4] This Court pointed out that, as Restatement (Second) of Torts § 242's authors acknowledged, removing conversion of a document as an element of conversion of intangible property would "not accord very well with the traditional common law limitations of conversion[.]" Jasen, 354 Md. at 561, 731 A.2d at 964 (quoting Restatement (Second) of Torts § 242 cmt. e).

Because Petitioners urge us to overrule Jasen, 354 Md. at 562, 731 A.2d at 965, this case implicates *stare decisis*. Under *stare decisis*, absent "extremely narrow" exceptions, an appellate court does not overrule its precedent. DRD Pool Serv., Inc. v. Freed, 416 Md. 46, 63, 5 A.3d 45, 55 (2010) (citation omitted). *Stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Id. at 63, 5 A.3d at 55 (citation and internal quotation marks omitted). An appellate court need not adhere to *stare decisis* where "changed conditions or increased knowledge" have rendered the appellate court's precedent "unsound in the circumstances of modern life, a

---

[4]In Jasen, 354 Md. at 564, 562-63, 731 A.2d at 966, 965, this Court concluded that the plaintiffs failed to state claims for conversion of stock and interests in a partnership because the plaintiffs did not allege that the defendant converted stock certificates or documents that purportedly embodied the right to the interests in the partnership.

vestige of the past, [and] no longer suitable to [the] people[.]" Id. at 64, 5 A.3d at 56 (citation and internal quotation marks omitted); see also State v. Stachowski, 440 Md. 504, 520, 103 A.3d 618, 627 (2014) ("We may decline to follow [*stare decisis*] when . . . the precedent has been rendered archaic and inapplicable to modern society through the passage of time and evolving events[.]" (Citation omitted)).[5]

Here, we reaffirm Jasen, 354 Md. at 562, 731 A.2d at 965, and again hold that a defendant does not convert a plaintiff's intangible property where the defendant does not convert a document that embodies the plaintiff's right to the plaintiff's intangible property; far from archaic, Jasen remains as suitable to society today as it was when this Court issued it. Petitioners' attack on Jasen is based on the false premise that, for conversion's purposes, the document that embodies the plaintiff's right to the plaintiff's intangible property must be paper (as opposed to digital). To the contrary, such a document need not be paper, as long as it is tangible and transferable; in Jasen, id. at 562, 563, 564, 731 A.2d at 965, 966, without ever using the word "paper," this Court characterized such a document as "tangible" in three instances, and as "transferable" in another. Digital media is both tangible (*i.e.*, capable of being seen on an electronic device's screen) and transferable (*i.e.*, subject to an exertion of ownership or dominion). See, e.g., Thyroff v. Nationwide Mut. Ins. Co., 864 N.E.2d 1272, 1278 (N.Y. 2007) ("[I]t is customary that stock ownership

---

[5]Additionally, an appellate court need not adhere to *stare decisis* where the appellate court's precedent was "clearly wrong and contrary to established principles." Freed, 416 Md. at 64, 5 A.3d at 55 (citation and internal quotation marks omitted). Here, however, Petitioners expressly concede that Jasen, 354 Md. at 562, 731 A.2d at 965, was not clearly wrong and contrary to established principles.

exclusively exists in electronic format. Because shares of stock can be transferred by mere computer entries, a thief can use a computer to access a person's financial accounts and transfer the shares to an account controlled by the thief. Similarly, electronic documents and records stored on a computer can also be converted by simply pressing the delete button[.]" (Citation omitted)). Thus, as the Honorable Glenn T. Harrell, Jr. concluded in Medi-Cen Corp. of Md. v. Birschbach, 123 Md. App. 765, 777 n.6, 720 A.2d 966, 972 n.6 (1998), for conversion's purposes, there is "no distinction between hard copy and electronic data[,]" as long as a document, either paper or digital, embodies the plaintiff's right to the plaintiff's intangible property.[6]

In sum, because digital media is capable of being converted, there is no need for us to "modernize" conversion by adopting Restatement (Second) of Torts § 242(2) ("One who effectively prevents the exercise of intangible [property] rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted."). Several other considerations militate against adopting Restatement (Second) of Torts § 242(2)—*i.e.*, removing conversion of a document as an element of conversion of intangible property.

First, to remove conversion of a document as an element of conversion of intangible property would destroy conversion's common law foundation. Ever since its inception,

---

[6]In Birschbach, 123 Md. App. at 769, 777, 786, 20 A.2d at 968, 972, 976, a plaintiff sued for conversion of accounts receivable that "were represented by hard copies or electronic data"; a trial court entered judgment in the plaintiff's favor; and the Court of Special Appeals reversed and remanded, holding that "the trial court's valuation of the accounts receivable was unsupported" and that "further proceedings regarding the appropriate measure of damages as to the uncollected accounts receivable" were necessary.

conversion has been based on a defendant taking a plaintiff's personal property. See

Nickens, 429 Md. at 77, 54 A.3d at 756 (A "[c]onversion is [a defendant's] intentional . . .

exertion of ownership or dominion over [a plaintiff]'s personal property in denial of or

inconsistent with the [plaintiff]'s right to [the plaintiff's personal] property." (Citations

omitted)). Even as conversion expanded to apply to a plaintiff's intangible property (such

as shares of stock), conversion has remained based on a defendant taking a plaintiff's

personal property—in the form of a document (such as a stock certificate) that embodies

the plaintiff's right to the plaintiff's intangible property. See Jasen, 354 Md. at 562, 731

A.2d at 965 ("[C]onversion generally may extend to the type of intangible property rights

that are merged or incorporated into a transferable document."). To no longer require a

defendant's taking of a plaintiff's personal property would distort conversion into an

entirely different tort. See id. at 561, 731 A.2d at 964 (Removing conversion of a document

as an element of conversion of intangible property would "not accord very well with the

traditional common law limitations of conversion[.]" (Quoting Restatement (Second) of

Torts § 242 cmt. e)).

Second, to remove conversion of a document as an element of conversion of

intangible property would expand conversion so much that it could essentially swallow

other torts, such as unfair competition and wrongful interference with contractual or

business relations, also known as tortious interference with contract or with economic

relations. See Jasen, 354 Md. at 562, 731 A.2d at 964 (Instead of expanding conversion,

"it would seem preferable to fashion other remedies, such as unfair competition, to protect

people from having intangible [property] values used and appropriated in unfair ways."

(Citation omitted)); Elecs. Store, Inc. v. Cellco P'ship, 127 Md. App. 385, 407, 732 A.2d 980, 991 (1999) (Unfair competition is "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." (Quoting Balt. Bedding Corp. v. Moses, 182 Md. 229, 237, 34 A.2d 338, 342 (1943)) (internal quotation marks omitted)); Kaser v. Fin. Prot. Mktg., Inc., 376 Md. 621, 628-29, 831 A.2d 49, 53 (2003) (Wrongful interference with contractual or business relations is comprised of: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." (Citation, footnote, and internal quotation marks omitted)).[7] Without conversion of a document as one of its elements, conversion of intangible property would essentially be any kind of interference by a defendant with a plaintiff's right to the plaintiff's intangible property, and would thus overlap with almost any unfair competition or wrongful interference with contractual or business relations.

Third, to remove conversion of a document as an element of conversion of intangible property could lead to expanding and distorting conversion one small step further—by removing as an element of conversion of intangible property the existence of a document that embodies a plaintiff's right to the plaintiff's intangible property. In other words, a defendant would be able to convert a plaintiff's intangible property even where

---

[7]As Witherspoon's counsel posited at oral argument, removing conversion of a document as an element of conversion of intangible property would encourage plaintiffs to assert claims for conversion instead of claims for wrongful interference with contractual or business relations so that the plaintiffs would not need to prove malice.

- 12 -

no document embodied the plaintiff's right to the plaintiff's intangible property (for example, as in the case of a business's goodwill). Restatement (Second) of Torts § 242's authors indicated that removing conversion of a document as an element of conversion of intangible property could lead to removing a document's existence as an element of conversion of intangible property. See Restatement (Second) of Torts § 242 cmt. f ("Thus far the liability stated in Subsection (2) has not been extended beyond the kind of intangible [property] rights which are customarily represented by and merged in a document. It is at present the prevailing view that there can be no conversion of an ordinary debt not represented by a document, or of such intangible [property] rights as the goodwill of a business or the names of customers. The process of extension [of conversion] has not, however, necessarily terminated; and nothing that is said in this Section is intended to indicate that in a proper case liability for intentional interference with some other kind of intangible [property] rights may not be found."). Such an expansion of conversion would cause confounding problems of proof for both parties; plaintiffs would have difficulty articulating how defendants "took" the plaintiffs' intangible property where there was no document to be taken, and defendants would have difficulty defending, given that the absence of any document would no longer be a defense.

Finally, as Petitioners' counsel candidly conceded at oral argument,[8] no other jurisdiction has expressly adopted Restatement (Second) of Torts § 242(2). In their original

---

[8]Petitioners' counsel's concession at oral argument seemingly contradicts Petitioners' assertion in their reply brief that there is a "trend toward adopting" Restatement (Second) of Torts § 242(2).

brief, Petitioners misplaced their reliance on out-of-State cases that do not weigh in favor of adopting Restatement (Second) of Torts § 242(2).

Specifically, Petitioners relied on four unreported opinions in which courts in other jurisdictions favorably cited Restatement (Second) of Torts § 242(2). See Hunt v. Team Performance, Inc., No. CV08-69-S-EJL, 2009 WL 2044682, at *6 n.11 (D. Idaho July 8, 2009); Sports Imaging of Ariz. L.L.C. v.1993 CKC Trust, No. 1 CA-CV 05-0205, 2008 WL 4448063, at *26 (Ariz. Ct. App. Sept. 30, 2008); Zanker Grp., LLC v. Summerville at Litchfield Hills, LLC, No. UWYCV044010223S, 2006 WL 2130382, at *5 (Conn. Super. Ct. July 18, 2006); Butko v. Stewart Title Co. of Wash., Inc., 991 P.2d 697, 710 (Wash. Ct. App. 2000) (depublished); see also Dore v. Sweports Ltd., Nos. 1-12-1980, 1-13-2418, 2014 WL 1757896, at *4 (Ill. App. Ct. Apr. 28, 2014) (favorably citing Restatement (Second) of Torts § 242 cmt. b). Unreported opinions do not constitute law, even in the jurisdictions whose courts issued them; thus, Petitioners' reliance on the above cases is misplaced.

Petitioners also relied on two out-of-State cases in which courts stated (just as this Court has held, and now holds again) that a defendant can convert a plaintiff's intangible property under certain circumstances. Compare Jasen, 354 Md. at 562, 731 A.2d at 965 ("[C]onversion generally may extend to the type of intangible property rights that are merged or incorporated into a transferable document.") with M.C. Multi-Family Dev., L.L.C. v. Crestdale Assocs., Ltd., 193 P.3d 536, 543 (Nev. 2008) ("'[W]here there is conversion of a document in which intangible [property] rights are merged, the damages include the value of such rights.'" (Quoting Restatement (Second) of Torts § 242(1)) and

- 14 -

<u>Hinkle Oil & Gas, Inc. v. Bowles Rice McDavid Graff & Love LLP</u>, 617 F. Supp. 2d 447, 455 (W.D. Va. 2008), <u>aff'd</u>, 360 F. App'x 400 (4th Cir. 2010) (There is "an action for the conversion of intangible [property] rights merged within a document." (Footnote omitted)).

Similarly, Petitioners relied on an out-of-State case in which a court held (just as we do and the Court of Special Appeals has) that, for conversion's purposes, the document that embodies the plaintiff's right to the plaintiff's intangible property can be digital (as opposed to paper). <u>Compare</u> <u>Birschbach</u>, 123 Md. App. at 777 n.6, 720 A.2d at 972 n.6 (For conversion's purposes, there is "no distinction between hard copy and electronic data[,]" as long as a document, either paper or digital, embodies the plaintiff's right to the plaintiff's intangible property.) <u>with</u> <u>Thyroff</u>, 864 N.E.2d at 1278 ("[E]lectronic records that [a]re stored on a computer and [a]re indistinguishable from printed documents[ are] subject to a claim of conversion[.]").

Petitioners also relied on an out-of-State case in which a court held a plaintiff established a claim, not for conversion, but instead for tortious deprivation of an interest in a corporation. <u>See</u> <u>Monterrey Mexican Rest. of Wise, Inc. v. Leon</u>, 638 S.E.2d 879, 887 (Ga. Ct. App. 2006) ("Although technically the circumstances of the case at bar do not amount to conversion, nonetheless, under these facts, there has been a deprivation of [the plaintiff]'s stock interest in the Corporation.").

That said, Petitioners relied on one out-of-State case in which a court, at least implicitly, endorsed the principle behind Restatement (Second) of Torts § 242(2). Specifically, in <u>Fremont Indem. Co. v. Fremont Gen. Corp.</u>, 148 Cal. App. 4th 97, 103,

- 15 -

125-26 (2007), the Second District Court of Appeal of California held that a plaintiff stated a claim for conversion of the plaintiff's net operating losses,[9] even though the plaintiff's right to the net operating losses was not "merged or reflected in a document[.]" In other words, that Court concluded that a defendant can convert a plaintiff's intangible property even where no document embodies the plaintiff's right to the plaintiff's intangible property. Thus, that Court implicitly concluded that, as Restatement (Second) of Torts § 242(2) contemplates, a defendant can convert a plaintiff's intangible property even where the defendant does not convert a document that embodies the plaintiff's right to the plaintiff's intangible property.

For three reasons, however, we are unpersuaded by Fremont Indem., 148 Cal. App. 4th at 103, 125-26. First, as we did above, the Second District Court of Appeal of California correctly acknowledged that conversion should not be expanded so much that it could essentially swallow other torts, see id. at 124 ("[N]ewer economic torts have developed that may better take into account the nature and uses of intangible property, the interests at stake, and the appropriate measure of damages. On the other hand, if the law of conversion can be adapted to particular types of intangible property and will not displace other, more suitable law, it may be appropriate to do so." (Citation omitted)); in its analysis of conversion, however, that Court did not address whether that Court's holding would expand conversion so much that it could essentially swallow other torts. Second, in

---

[9]The net operating losses were valuable because, "[b]y carrying over or carrying forward a net operating loss, a taxpayer can reduce its taxable income in a given year." Fremont Indem., 148 Cal. App. 4th at 105 n.1 (citation omitted).

Fremont Indem., id. at 123-24, the Second District Court of Appeal of California was bound by, and relied on, Payne v. Elliot, 54 Cal. 339, 342, 340 (1880), in which the Supreme Court of California held that a plaintiff stated a claim for conversion of shares of stock, even though the plaintiff did not allege that the defendants converted stock certificates; Payne, id., is itself unpersuasive, as the Supreme Court of California did not explain how the defendants allegedly converted shares of stock without allegedly converting stock certificates,[10] thus rendering unclear whether some of that Court's statements were *dicta*. See, e.g., Payne, 54 Cal. at 342 ("[I]f [conversion] is maintainable for the [stock] certificate, there is no valid reason why [conversion] is not also maintainable for the thing itself which the [stock] certificate represents"—*i.e.*, shares of stock.). Third, Fremont Indem. is not the law of California; in Fremont Indem., 148 Cal. App. 4th at 125, the Second District Court of Appeal of California contributed to a split of authority within that State by "declin[ing] to follow" cases from two other intermediate appellate courts in California: (1) Olschewski v. Hudson, 262 P. 43, 46, 44 (Cal. Ct. App. 1927) (The First District Court of Appeal of California held that a plaintiff failed to state a claim for conversion of an unwritten "laundry route" (*i.e.*, the set of a laundry's customers); that Court reconciled its holding with Payne, 54 Cal. 339, on the grounds that part of Payne

---

[10]In Payne, 54 Cal. at 342, the Supreme Court of California stated that "a transfer on the books of the corporation, without the issuance of a [stock] certificate, vests title in the [stock]holder"; however, that Court did not indicate that the defendants in Payne allegedly effectuated such a transfer. Elsewhere in Payne, id. at 342-44, that Court stated that the shares of stock were allegedly "delivered" to and "received" by the defendants, thus indicating—contrary to another part of Payne, id. at 340—that the defendants allegedly converted stock certificates.

was *dicta*, and that <u>Payne</u> involved shares of stock, which "are represented by [stock] certificates[.]"); and (2) <u>Thrifty-Tel, Inc. v. Bezenek</u>, 46 Cal. App. 4th 1559, 1565 (1996) (The Fourth District Court of Appeal of California stated in *dicta* that "[c]ourts have traditionally refused to recognize as conversion the unauthorized taking of intangible interests that are not merged with, or reflected in, something tangible." (Citations omitted)). The Supreme Court of California has not resolved this split of authority. Thus, no jurisdiction, including California, has expressly adopted Restatement (Second) of Torts § 242(2), and we decline Petitioners' invitation to make Maryland the first to do so.

Instead, Maryland will remain among the many jurisdictions that maintain conversion of a document as an element of conversion of intangible property (and thus reject the principle behind Restatement (Second) of Torts § 242(2)). <u>See, e.g.</u>, <u>Narragansett Elec. Co. v. Carbone</u>, 898 A.2d 87, 97 (R.I. 2006) ("[A] conversion action will not lie for a partnership interest or other intangible property right that is not manifested by a tangible instrument, such as a written agreement, a bankbook, or a promissory note, that may, in turn, be converted." (Citations and internal quotation marks omitted)); <u>Rehak Creative Servs., Inc. v. Witt</u>, 404 S.W.3d 716, 734 (Tex. App. 2013) ("[I]ntangible property cannot be converted unless the underlying intangible [property] right has been merged into a document that has been converted." (Citations omitted)); <u>The Film & Tape Works, Inc. v. Junetwenty Films, Inc.</u>, 856 N.E.2d 612, 624 (Ill. App. Ct. 2006) ("[I]ntangible property rights cannot be the subject of conversion unless they are merged into a tangible document over which the [defendant] exercised dominion or ownership." (Citations omitted)).

At the same time, Maryland will continue to endorse Restatement (Second) of Torts § 242(1) ("Where there is conversion of a document in which intangible [property] rights are merged, the damages include the value of such rights."), see Jasen, 354 Md. at 562, 731 A.2d at 965 ("[C]onversion generally may extend to the type of intangible property rights that are merged or incorporated into a transferable document."); thus, Maryland will continue to construe conversion more broadly than jurisdictions in which a defendant cannot convert a plaintiff's intangible property. See, e.g., Beshara v. S. Nat'l Bank, 928 P.2d 280, 289 n.26 (Okla. 1996) ("[O]nly tangible personal property may be converted." (Citation omitted)); Wells v. Chattanooga Bakery, Inc., 448 S.W.3d 381, 392 (Tenn. Ct. App. 2014) ("[A]n action for the conversion of intangible personal property is not recognized in Tennessee." (Citation omitted)).

We are unpersuaded by Petitioners' reliance on the following quotation from Lawson, 69 Md. App. at 481, 518 A.2d at 176: "The [] Court of Appeals has been about as liberal in [the] expansion [of conversion] as any court." In the following paragraph, the Court of Special Appeals clarified: "Notwithstanding this expansion, there do remain some limits to [conversion]. The initial focus continues to be on the tangible item withheld." Id. at 481, 518 A.2d at 176. This comports with Jasen, 354 Md. at 561, 731 A.2d at 964, in which this Court pointed out that removing conversion of a document as an element of conversion of intangible property would "not accord very well with the traditional common law limitations of conversion[.]" (Quoting Restatement (Second) of Torts § 242 cmt. e).

For the above reasons, we again hold that a defendant does not convert a plaintiff's intangible property where the defendant does not convert a document that embodies the

plaintiff's right to the plaintiff's intangible property.

Applying our holding to this case's facts, we conclude that Petitioners failed to establish a claim against Witherspoon for conversion of the life insurance policy, as Petitioners failed to establish that Witherspoon converted any document that embodied Petitioners' right to the life insurance policy. It is undisputed that the Thompson Children, including Petitioners, owned the life insurance policy. We assume, without deciding, that: (1) the policy notices and policy statements that the life insurance company mailed to Witherspoon embodied Petitioners' right to the life insurance policy; and (2) Witherspoon intentionally exerted ownership or dominion over the policy notices and policy statements by receiving them in the mail and not informing Petitioners of their contents. That said, Petitioners did not offer any evidence that they did not consent to Witherspoon's intentional exertion of ownership or dominion over the policy notices and policy statements; to the contrary, Petitioners expressly consented to the life insurance company mailing the policy notices and policy statements to Witherspoon. Specifically, Petitioners signed the application for the life insurance policy, which listed Witherspoon's address under "Send Premium Notices To:[.]" Because Petitioners consented to Witherspoon's intentional exertion of ownership or dominion over the policy notices and policy statements, Witherspoon did not convert the policy notices and policy statements; accordingly, Witherspoon did not convert the life insurance policy.[11] Thus, the circuit court erred in

---

[11]Of course, we do not foreclose a determination that Witherspoon's acts and omissions constituted torts other than conversion; and, on remand, Petitioners' claims against Witherspoon for negligence, negligent misrepresentation, and deceit will remain.

denying Witherspoon's motion for judgment notwithstanding the verdict as to conversion.

## II.

Petitioners contend that the circuit court was correct in denying Witherspoon's motion for judgment notwithstanding the verdict as to constructive fraud, as they established a claim against Witherspoon for constructive fraud. Specifically, Petitioners argue that they established that the parties were in a confidential relationship, as: (1) Witherspoon was Petitioners' brother-in-law; (2) Witherspoon was a financial advisor, and Petitioners lacked financial expertise; and (3) Witherspoon was the life insurance policy's broker, and, during the relevant time frame, the life insurance company mailed all policy-related documents to Witherspoon's address.

Witherspoon responds that the circuit court erred in denying his motion for judgment notwithstanding the verdict as to constructive fraud, as Petitioners failed to establish a claim against him for constructive fraud. Specifically, Witherspoon contends that Petitioners failed to establish that the parties were in a confidential relationship, as: (1) Petitioners did not trust Witherspoon; (2) Petitioners did not depend on Witherspoon for financial advice; and (3) Petitioners did not depend solely on Witherspoon to know whether the annual life insurance premiums were being paid, as the Thompson Parents also knew whether the annual life insurance premiums were being paid.[12]

---

[12]Witherspoon also contends that Petitioners forfeited this Court's review of the issue of whether the parties were in a confidential, non-fiduciary relationship by failing to raise the issue in the Court of Special Appeals. We disagree. Petitioners raised in the Court of Special Appeals the broad issue of whether the parties were in a confidential relationship. As discussed below, all fiduciary relationships are confidential relationships,

A defendant commits constructive fraud against a plaintiff where the defendant "breach[es] a legal or equitable duty" to the plaintiff in a way that "tend[s] to deceive others, to violate public or private confidence, or to injure public interests." Canaj, Inc. v. Baker & Div. Phase III, LLC, 391 Md. 374, 421-22, 893 A.2d 1067, 1095 (2006) (quoting Md. Envtl. Trust v. Gaynor, 370 Md. 89, 97, 803 A.2d 512, 516-17 (2002)) (emphasis and internal quotation marks omitted).[13]

For constructive fraud's purposes, a defendant owes an equitable duty to a plaintiff where the parties are in a confidential relationship. See Gaynor, 370 Md. at 98-99, 97, 803 A.2d at 517, 516-17 (This Court held that the plaintiffs failed to establish a claim for constructive fraud where "[t]here was no fiduciary or confidential relationship existing between" the parties; thus, the defendant "had no duty to" take a certain action.); Gaggers v. Gibson, 180 Md. 609, 614, 613, 26 A.2d 395, 398, 397 (1942) (This Court held that the plaintiffs established a claim for constructive fraud where "[c]onfidence clearly was reposed in" the defendant.); Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc., 340 Md. 176, 198 n.6, 665 A.2d 1038, 1049 n.6 (1995) ("[C]onstructive fraud . . . usually arises from a breach of duty where a relationship of trust and confidence exists." (Citation

but not all confidential relationships are fiduciary relationships. Thus, establishing that the parties were in a fiduciary relationship is one way, but not the only way, to establish that the parties were in a confidential relationship.

[13]This case does not involve a legal duty, which a defendant owes to a plaintiff where a statute or Maryland Rule requires the defendant to meet an obligation for the plaintiff. See Jannenga v. Johnson, 243 Md. 1, 4-5, 220 A.2d 89, 91 (1966) (This Court held that a tenant established a claim for constructive fraud against a landlord where the landlord "failed to perform a legal duty[,]" as the landlord failed to comply with a Maryland Rule that required the landlord to attempt to provide certain notice to the tenant.).

omitted)); Hammond v. Lyon Realty Co., 163 Md. 442, 469, 163 A. 480, 490 (1932) (A

defendant "who bargains in a matter of advantage with a [plaintiff] placing confidence in

[the defendant], is bound to show that a reasonable use has been made of that confidence;

a rule applying equally to all persons standing in confidential relations with each other. If

no such proof is established, courts of equity treat the case as one of constructive fraud."

(Citations and internal quotation marks omitted)).

For constructive fraud's purposes, a plaintiff and a defendant are in a confidential

relationship where the defendant "has gained the [plaintiff's] confidence . . . and purports

to act or advise with the [plaintiff]'s interest in mind." Buxton v. Buxton, 363 Md. 634,

654, 770 A.2d 152, 164 (2001) (citation omitted). Accordingly, a plaintiff and a defendant

are in a confidential relationship only if the plaintiff depends on the defendant. See Upman

v. Clarke, 359 Md. 32, 41-42, 753 A.2d 4, 9 (2000) ("[T]o establish . . . a [confidential]

relationship[,] there must appear at least a condition from which dependence of the

[plaintiff] may be found[.]" (Citation and internal quotation marks omitted)). For example,

a plaintiff and a defendant are in a confidential relationship where the parties "stand in such

a relation to each other that [the plaintiff] must necessarily repose trust and confidence in

the [defendant's] good faith and integrity[.]" Id. at 42, 753 A.2d at 9 (citation and internal

quotation marks omitted). Thus, all fiduciary relationships are confidential relationships,

see id. at 42, 753 A.2d at 9 ("In some relationships, such as attorney-client or trustee-

beneficiary, a confidential relationship is . . . presumed as a matter of law."); B.N. v. K.K.,

312 Md. 135, 151, 538 A.2d 1175, 1183 (1988) ("[A] fiduciary [relationship] is

presumptively confidential[.]" (Citations omitted)), but not all confidential relationships

are fiduciary relationships, see Buxton, 363 Md. at 654, 770 A.2d at 164 ("A confidential relation may exist although there is no fiduciary relation; it is particularly likely to exist where there is a family relationship[.]" (Citation omitted)); Figgins v. Cochrane, 403 Md. 392, 410, 942 A.2d 736, 746 (2008) ("[W]hen a parent on account of old age and infirmity relies heavily upon the child for care and protection or for guidance in business affairs, then there exists a confidential relationship[.]" (Citations and internal quotation marks omitted)).

Applying these principles to this case's facts, we conclude that Petitioners failed to establish a claim against Witherspoon for constructive fraud, as Petitioners failed to establish that the parties were in a confidential relationship. Petitioners do not contend that the parties were in a fiduciary relationship, and instead misplace their reliance on three sets of circumstances in a vain attempt to establish that the parties were in a confidential relationship.[14]

First, the parties were not in a confidential relationship by virtue of the circumstance that Witherspoon was Petitioners' brother-in-law. A family relationship is not necessarily a confidential relationship; and, in any event, the types of family relationships that are most conducive to being confidential relationships are relationships between spouses and relationships between parents and children, not relationships between siblings or siblings-in-law. See Upman, 359 Md. at 42, 753 A.2d at 9 ("[I]n family relationships, such as

---

[14]Petitioners also misplace their reliance on other circumstances—such as Witherspoon's failure to tell Petitioners that the annual life insurance premiums were not being paid—that could establish a breach of an equitable duty, not the existence of an equitable duty in the first place.

parent-child and [spouse]-[spouse], the existence of a confidential relationship is an issue of fact and is not presumed as a matter of law." (Citation omitted)). Here, Petitioners do not point to any evidence that they reposed confidence in Witherspoon by virtue of the circumstance that Witherspoon was their brother-in-law; indeed, unlike the rest of the Thompson Children, Kathy disliked Witherspoon so much that she transferred her share of the life insurance premium directly to the life insurance company instead of maintaining an account over which Witherspoon had control.

Second, the parties were not in a confidential relationship by virtue of the circumstances that Witherspoon was a financial advisor and that Petitioners lacked financial expertise. Petitioners do not point to any evidence that they depended on Witherspoon for financial advice. Indeed, the core of Petitioners' claims against Witherspoon is simply that Witherspoon failed to inform them that the annual life insurance premiums were not being paid; any layperson who received the policy statements and policy notices that the life insurance company mailed to Witherspoon could have informed Petitioners that the annual life insurance premiums were not being paid, thus, Witherspoon's role as a financial advisor is of no moment.

Third, the parties were not in a confidential relationship by virtue of the circumstances that Witherspoon was the life insurance policy's broker and that, during the relevant time frame, the life insurance company mailed all policy-related documents to Witherspoon's address. Petitioners did not solely depend on Witherspoon to know whether the annual life insurance premiums were being paid. In other words, Witherspoon was not the exclusive source of that information. The Thompson Parents—the ones who were

supposed to pay for the annual life insurance premiums, and who did so for years—obviously knew whether they were paying for the annual life insurance premiums.  At any time during the relevant time frame, Petitioners could have asked the Thompson Parents whether they were still paying for the annual life insurance premiums.  A plaintiff and a defendant are not in a confidential relationship where the plaintiff does not "depend[]" on the defendant.  Upman, 359 Md. at 41-42, 753 A.2d at 9 (citation omitted).

For the above reasons, Petitioners failed to establish a claim against Witherspoon for constructive fraud, as Petitioners failed to establish that the parties were in a confidential relationship.  Thus, the circuit court erred in denying Witherspoon's motion for judgment notwithstanding the verdict as to constructive fraud.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  PETITIONERS TO PAY COSTS.**

Circuit Court for Baltimore City
Case No. 24-C-08-005476
Argued: April 9, 2013

IN THE COURT OF APPEALS

OF MARYLAND

No. 76

September Term, 2014

_____

NANCY LEE KATHRYN THOMPSON,
ET AL.

v.

UBS FINANCIAL SERVICES, INC.,
ET AL.

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts

JJ.

_____

Concurring Opinion by McDonald, J., which
Barbera, C.J., and Adkins, J. join

_____

Filed: May 22, 2015

I join in the judgment of the Court, but not in its opinion. My primary concern has to do with the Court's emphatic embrace of the 1999 *Jasen* decision that limits the tort of conversion with respect to intangible property rights to circumstances where the defendant converts a document that embodies those rights. This seems antiquated, even if one is willing to include a "digital document" within the concept of document.[1] Many important and valuable property rights are not embodied in a physical document – or even something that could be called a "digital document." For example, few shareholders of corporations possess physical stock certificates – or even "digital" stock certificates – embodying their intangible economic rights as a shareholder. When physical certificates exist, they generally remain in a depository and changes in ownership are reflected, not by a transfer of the certificate, but by book entries by the custodian or by a bank or brokerage firm.[2] Similar

---

[1]The Court's opinion characterizes digital media as "tangible" and "transferable." Slip op. at 9-10. A computer hard drive or disk is, of course, a physical object susceptible to physical movement, but misappropriation of the economic rights that may be embodied in such media does not necessarily involve any dominion or control over the media itself.

[2]A recent law review article describes the current system for holding shares of corporations:

> Most owners of large public companies hold shares in street name accounts. Title remains in the name of a nominee, generally a broker or bank. Although the nominee retains legal title, the beneficial owner has a contractual right to the economic benefits associated with the shares. Transfer occurs through changes in book entries. This form of share ownership facilitates the efficient processing and settlement of securities transactions and reduces the administrative backlog by eliminating the use of physical certificates.
>
> Brokers and banks typically deposit the shares with The

methods for efficiently attributing and transferring other types of intangible economic rights are no doubt developing with advances in technology. The Court's holding in this case would seem to foreclose the possibility in many instances that one who has suffered a misappropriation of those rights could pursue a conversion remedy.

It seems that we should leave open the development of the tort of conversion to cover the misappropriation of such rights when other remedies prove unavailing – or at least we should allow for the development of a similar common law tort, perhaps under a different name. *See, e.g.,* 3 D. B. Dobbs, P.T. Hayden & E.M. Bublick, The Law of Torts §711 at p. 805 (2d ed. 2011) ("[I]t is also plausible to treat some accounts or "funds" as subject to conversion even where the defendant does not physically withhold a negotiable instrument from its owner. If the defendant, without authority to do so, transfers funds from the plaintiff's account to his own or another account, he is a converter even though the transfer is purely a bookkeeping entry, not a physical movement of cash.") That is what the Restatement, in a passage just following the sentence quoted several times in the Court's opinion,[3] suggests: "[C]ourts which prefer to adhere to the older theory may prefer to regard the liability as one for an intentional interference with the right, which is not identical with

Depository Trust Company (DTC), the world's largest securities depository.....

Bullard, *Proxy Distribution and the Requirement of Impartiality*, 91 Denv. U. L. Rev. Online 93, 95 (2014). The transfer of economic rights in shares thus does not involve a transfer of dominion or control over a "digital document."

[3]Slip op. at 8, 11, 19.

conversion, but is similar to it in its nature and legal consequences. It is, however, of very little practical importance whether the tort is called conversion, or a similar tort with another name. In either case the recovery is for the full value of the intangible right so appropriated." Restatement (Second) of Torts §242, *comment e*.

Chief Judge Barbera and Judge Adkins have indicated that they join this opinion.

3