*Thomas Clifford Wallace v. State of Maryland*, No. 29, September Term, 2016.  Opinion by Getty, J.

**CRIMINAL PROCEDURE — POSTCONVICTION DNA TESTING STATUTE — DUTY TO PRESERVE SCIENTIFIC IDENTIFICATION EVIDENCE**

Black t-shirt worn by appellant at the time of his arrest did not constitute "scientific identification evidence" as defined by the Postconviction DNA Testing Statute, Maryland Code, Criminal Procedure Article ("CP") § 8-201.  Multiple eyewitnesses described appellant as wearing a white t-shirt when the crime occurred, and appellant admitted that he did not obtain the black t-shirt until later that day.  Thus, even if the black t-shirt contained hair fibers, there was no possibility that testing those fibers "may produce exculpatory or mitigating evidence relevant to" appellant's claim of wrongful conviction.  CP § 8-201(a)(5)(iii).  Accordingly, the State did not have a duty to preserve the black t-shirt under the Statute, and appellant was not entitled to a hearing to determine whether the State's failure to produce the black t-shirt "was the result of intentional and willful destruction."  CP § 8-201(j)(3)(i).

**CRIMINAL PROCEDURE — POSTCONVICTION DNA TESTING STATUTE — APPOINTMENT OF COUNSEL**

*Fuster v. State*, 437 Md. 653 (2014), holding that appointment of counsel under the Postconviction DNA Testing Statute is discretionary, is not "clearly wrong or contrary to established principles," and has not "been superseded by significant changes in the law or facts," such that it would be appropriate for the Court to overrule its own precedent.  Circuit court did not abuse its discretion in declining to appoint counsel for appellant where appellant did not request counsel in his petition, appellant had previously litigated a postconviction proceeding represented by counsel, and court perceived appellant's potential for success as being minimal.

Circuit Court for Washington County
Case No. 21-K-00-26006
Argued: February 7, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 29

September Term, 2016

_____

THOMAS CLIFFORD WALLACE

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Getty, J.

_____

Filed: April 21, 2017

The Postconviction DNA Testing Statute provides for postconviction review related to DNA evidence for individuals convicted of certain enumerated offenses. *See generally* Md. Code (2001, 2008 Repl. Vol.), Criminal Procedure Article ("CP") § 8-201. When the Maryland General Assembly passed the Statute in 2001, the legislature was responding to a nationwide concern over individuals being wrongfully convicted for serious crimes and held in prison for many years. *Blake v. State*, 395 Md. 213, 219 (2006). Prior to 2001, a convicted person could only file one postconviction petition within ten years of being sentenced, and the court retained the discretion to reopen a postconviction proceeding if to do so was "in the interests of justice." Dep't Legis. Servs., *Fiscal and Policy Note (Revised), Senate Bill 694*, at 3 (2001 Session).[1] Under the Statute, a convicted person can "obtain DNA testing of evidence when either the DNA tests were not available or not as sophisticated at the time the inmate was convicted." *Id.* Thus, the Postconviction DNA Testing Statute provides convicted persons a second bite of the postconviction apple.[2]

The Statute also establishes separate procedures for these postconviction proceedings. An individual convicted of a qualifying offense may file a petition for either

[1] http://mgaleg.maryland.gov/2001rs/fnotes/bil_0004/sb0694.PDF [https://perma.cc/5NT4-RE84].

[2] The General Assembly has amended the Postconviction DNA Testing Statute numerous times since its enactment in 2001, including once during the course of proceedings in the circuit court in this case. *See* 2015 Md. Laws, ch. 369. The 2015 amendments, which took effect after the petition was filed but before the circuit court issued its decision, are not at issue in this appeal. Therefore, all references to the Statute in this opinion are to the 2008 version, which took effect on January 1, 2009. *See* 2008 Md. Laws, ch. 337. For a detailed discussion of previous amendments to the Statute, see *Gregg v. State*, 409 Md. 698, 708–12 (2009).

"DNA testing of scientific identification evidence that the State possesses . . . that is related to the judgment of conviction; or . . . a search by a law enforcement agency of a law enforcement data base or log for the purpose of identifying the source of physical evidence used for DNA testing." CP § 8-201(b). If the circuit court denies the petition, the petitioner can appeal directly to this Court. CP § 8-201(k)(6).

Furthermore, the Statute imposes on the State a duty to preserve certain evidence that might later be subject to DNA testing. *See* CP § 8-201(j). If the State fails to produce evidence that it had a duty to preserve, then the petitioner is entitled to a hearing for "the court to determine whether the failure to produce evidence was the result of intentional and willful destruction." CP § 8-201(j)(3)(i).

In this case, the appellant, Thomas Clifford Wallace, filed a petition in the Circuit Court for Washington County requesting a hearing under CP § 8-201(j)(3)(i) because the State admitted that it had destroyed the requested evidence—a black t-shirt that Mr. Wallace was wearing when he was arrested in 1997. The circuit court denied Mr. Wallace's petition, concluding that the black t-shirt did not constitute "scientific identification evidence," as defined by the Statute, and therefore the State did not have a duty to preserve it. On appeal, Mr. Wallace challenges the denial of his petition, as well as the circuit court's decision not to appoint counsel to represent Mr. Wallace at the proceedings on his petition. For the following reasons, we shall affirm the circuit court's judgment on both issues.

**BACKGROUND**

*A.*     *The Crime*

2

Darrius Fetterhoff disappeared from Hagerstown, Maryland on August 20, 1997, after driving his wife to work that morning. Five days later, on August 25, two men on a raft on Conococheague Creek in Washington County saw a man lying in the rocks along the creek bank. They called out to the man and told him they were going to get him help; the man raised his right hand. Later that day, when police officers located the man, he was unconscious but still alive. They identified the man as Mr. Fetterhoff. Three days later, on August 28, he died in the hospital without regaining consciousness. The medical examiner testified that the cause of death was multiple blunt force injuries to the head, torso, and extremities, including a fractured skull and ribs. One can only speculate what the five days lying injured in the rocks were like for Mr. Fetterhoff.

During the investigation into Mr. Fetterhoff's disappearance and murder, police identified three key witnesses who later testified at Mr. Wallace's trial. Keisha Russ recounted that on the morning of August 20, she witnessed Clara Miller driving a car with Mr. Wallace in the passenger seat and Mr. Fetterhoff in the back seat. Ms. Russ, who knew all three occupants from previous encounters with them, described Ms. Miller as a white female, Mr. Wallace as a black male, and Mr. Fetterhoff as a white male. Later in the day, Ms. Russ saw Mr. Wallace and Ms. Miller at an apartment.[3] By that time, Mr. Wallace was shirtless and had a bloody rag wrapped around his hand.

---

[3] Ms. Miller also gave statements to the police implicating Mr. Wallace in Mr. Fetterhoff's murder, and the State charged her as a co-defendant in the case. She went missing in September 1997, and was found dead in March 1998. Her murder remains unsolved.

Kim Stottlemeyer testified that, while driving on August 20, she was stopped by a black male who asked if he could siphon some gasoline from her car. She described the man as wearing a white t-shirt with red stains on it and later identified Mr. Wallace as the man she encountered. She also stated that he was with a female passenger.

Robert Kursey testified that, while driving on the same road as Ms. Stottlemeyer on August 20, he saw a car in the middle of the road and a black male talking to someone inside the car. The man approached Mr. Kursey and asked him for a ride into town. Mr. Kursey drove the man and the woman who had been inside the car into town. He stated that the man had a bloody white t-shirt wrapped around his hand, and later identified Mr. Wallace as the man he encountered.

Also on August 20, at 6:20 p.m., the Washington County Narcotics Task Force arrested Mr. Wallace for drug charges, unrelated to Mr. Fetterhoff's disappearance and murder, and placed him in the Washington County Detention Center ("WCDC"). When he was arrested, Mr. Wallace was wearing a black t-shirt and blue shorts. WCDC officials inventoried and stored those items, along with other personal effects, at the time of Mr. Wallace's arrest.

## B. The Physical Evidence

On August 30, 1997, after connecting Mr. Wallace to Mr. Fetterhoff's death through witness statements, Corporal Roy Harsh of the Washington County Sheriff's Department decided to review WCDC's property record for Mr. Wallace. At that time, Corporal Harsh took possession of all of Mr. Wallace's property, including the black t-shirt and blue shorts he had been wearing when he was arrested, and placed the items in the Washington County

4

Sheriff's Department's property room. In his affidavit for a search and seizure warrant, Corporal Harsh noted the following observations regarding Mr. Wallace's clothes: "When the tee shirt & dark blue shorts were packaged separately for storage, **I observed hair fibers on the shirt** & unidentified stains on the shorts." (Emphasis added.)

Forensic chemist Jeffrey Kercheval of the Western Maryland Regional Crime Laboratory examined Mr. Wallace's property and found "no stains consistent with blood" on the black t-shirt, but identified "stains consistent with blood" on the shorts. Mr. Kercheval's report made no mention of any hair fibers on any of the items. DNA testing on the shorts later confirmed that the stains were in fact blood, and that it was Mr. Fetterhoff's blood. The black t-shirt was never tested for DNA.

Investigators also recovered hair fibers from Mr. Fetterhoff's car—the same car that was seen by Ms. Stottlemeyer and Mr. Kursey on the morning Mr. Fetterhoff disappeared, which police found abandoned near the site where they later recovered Mr. Fetterhoff. Forensic scientist David Exline compared three of these hair fibers to known hair samples submitted by Mr. Wallace. Mr. Exline concluded that the hair fibers from the car were "Negroid in origin," which he defined as originating from an individual in the African-American population. He determined that two of the hair fibers "exhibited characteristics that were unlike the known hair samples submitted from Mr. Wallace." The third hair fiber "exhibited some similarities but also some differences" to Mr. Wallace's hair samples, so Mr. Exline could not conclusively determine whether it originated from Mr. Wallace.

C.      *The Trial, Direct Appeals, and First Postconviction Proceeding*

5

On November 30, 2000, a jury in the Circuit Court for Washington County convicted Mr. Wallace of first- and second-degree murder, first-degree assault, and the unlawful taking of a motor vehicle. On March 8, 2001, the circuit court, Judge John H. McDowell presiding, sentenced Mr. Wallace to life imprisonment without the possibility of parole for first-degree murder, and to a concurrent five-year term of imprisonment for the unlawful taking of a motor vehicle. The second-degree murder and first-degree assault convictions merged into the first-degree murder conviction for sentencing purposes. Mr. Wallace appealed his convictions to the Court of Special Appeals, which affirmed the convictions on May 9, 2002, in an unreported opinion. Mr. Wallace petitioned this Court for a writ of certiorari, which we granted on August 22, 2002. *Wallace v. State*, 370 Md. 268 (2002). We affirmed the judgment of the Court of Special Appeals on February 13, 2003. *Wallace v. State*, 373 Md. 69 (2003).

Mr. Wallace filed his first Petition for Postconviction Relief on May 27, 2009. The Circuit Court for Washington County, Judge Donald Beachley presiding, held a hearing on the petition on May 26, 2011. Appointed counsel represented Mr. Wallace at the hearing. On September 15, 2011, the circuit court granted Mr. Wallace's petition in part, allowing him to file an application for review of his sentence by a three-judge panel pursuant to Maryland Rule 4-352. The circuit court denied Mr. Wallace's petition with regard to all other relief sought.[4] Mr. Wallace filed an application for review of his sentence on

---

[4] Mr. Wallace's first postconviction petition is not part of the record in this case. Thus, this Court is unaware of what other relief Mr. Wallace requested in that petition.

6

September 21, 2011. On November 1, 2011, a three-judge review panel declined to increase, decrease, or otherwise modify Mr. Wallace's sentence.

**D.      *The Postconviction DNA Petition***

On May 23, 2013, Mr. Wallace filed a Public Information Act Request with the Office of the State's Attorney for Washington County requesting the results of any testing performed on the hair fibers from the black t-shirt he was wearing when he was arrested on August 20, 1997. Assistant State's Attorney Gina Cirincion, one of the prosecutors who tried Mr. Wallace's case, responded to the PIA Request in a letter dated March 11, 2014. Ms. Cirincion stated that there was no reference in Mr. Wallace's case file to any hair fibers on the black t-shirt "other than the sentence included in the search warrant affidavits prepared by [Corporal] Harsh. There is no other record, and no testing was ever done." Ms. Cirincion further stated that her co-counsel in Mr. Wallace's case had no recollection of any hairs being found on the black t-shirt, nor did the forensic chemist Mr. Kercheval who processed all of the evidence in his case. Ms. Cirincion also revealed that the "actual evidence," i.e. the black t-shirt, "was destroyed on February 28, 2003, after the appellate process was exhausted."

On April 29, 2014, Mr. Wallace filed a Petition for a Postconviction DNA Hearing pursuant to CP § 8-201. In his petition, Mr. Wallace asserted that the hair fibers found on the black t-shirt "would exonerate him," but he was "prevented from presenting this exculpatory evidence because it was destroyed," without notification to either himself or

7

his counsel as required by CP § 8-201(k)(1).[5]  Therefore, Mr. Wallace requested a hearing pursuant to CP § 8-201(j)(3) "to determine whether the [State's] failure to produce evidence was the result of intentional and willful destruction."

The State answered Mr. Wallace's petition on May 1, 2014, asserting that Mr. Wallace was not entitled to a hearing under CP § 8-201(j)(3) because the black t-shirt did not constitute "scientific identification evidence" as defined by the Statute.  The State admitted that the black t-shirt had been destroyed, but denied that it had a duty to preserve the t-shirt under the Statute.  The State asserted that "[t]here is no conceivable fashion in which either the shirt or the alleged fibers could have produced 'exculpatory or mitigating evidence relevant to a claim of . . . wrongful conviction'" because the shirt was only associated with Mr. Wallace, and not with the victim or the crime scene.  (Ellipsis in original) (quoting CP § 8-201(a)(5)(iii)).  Mr. Wallace responded to the State's answer on May 14, 2014, and filed an amended petition on June 10, 2014.

### E.    *Hearings and Orders in the Circuit Court*

---

[5] CP § 8-201(k)(1) provides,

> The State may dispose of scientific identification evidence before the expiration of the time period described in subsection (j) of this section if the State notifies the following persons:
>
>> (i) the person who is incarcerated in connection with the case;
>>
>> (ii) any attorney of record for the person incarcerated; and
>>
>> (iii) the Office of Public Defender for the judicial district in which the judgment of conviction was entered.

8

The Circuit Court for Washington County, Judge Donald Beachley presiding, held a hearing on the petition on December 4, 2014. During that hearing, the State again asserted that a hearing to determine whether its destruction of the black t-shirt "was intentional and willful" was unnecessary because the t-shirt did not satisfy the statutory definition of "scientific identification evidence." Furthermore, the State asserted that if the court did decide to have a hearing, it would be required to appoint counsel for Mr. Wallace. Mr. Wallace did not include a request for the appointment of counsel in either his petition or his amended petition, nor in his response to the State's answer. However, Mr. Wallace did indicate a desire for appointed counsel during the December 4 hearing.

On December 18, 2014, the circuit court issued a memorandum order in which it concluded that a hearing was required "in the interest of justice" to determine whether the black t-shirt satisfied the statutory definition of "scientific identification evidence." Furthermore, the circuit court disagreed with the State that it was required to appoint counsel for Mr. Wallace. Instead, the court determined that under Maryland Rule 4-707(b) and *Fuster v. State*, 437 Md. 653 (2014), the appointment of counsel for a hearing under the Postconviction DNA Testing Statute is within the court's discretion. The court then declined to appoint counsel for Mr. Wallace, noting that he "ha[d] actually litigated a prior petition for post conviction relief[,] and in consideration of the potential for success in the present case." Mr. Wallace subsequently filed a Petition for Appointment of Counsel on August 27, 2015, which the circuit court denied on September 4, 2015.

The circuit court held another hearing on May 4, 2016, during which the State and Mr. Wallace debated whether the black t-shirt constituted "scientific identification

9

evidence" under the Statute. Mr. Wallace indicated at the start of the hearing that he had been attempting to obtain counsel, but was unsuccessful. He then indicated that he was ready to proceed with the hearing and represent himself. During the hearing, Mr. Wallace acknowledged that he did not obtain the black t-shirt until after the murder "allegedly" occurred.

On May 31, 2016, the circuit court issued a memorandum opinion and order denying Mr. Wallace's Petition for a Postconviction DNA Hearing. In its opinion, the court found that Mr. Wallace had "utterly failed to show any connection between the black shirt he was wearing on the evening of August 20 and the murder that occurred earlier that day." Therefore, the court concluded "that there is no reasonable probability that DNA testing of the black t-shirt would have produced exculpatory or mitigating evidence."

Mr. Wallace noted an appeal of the circuit court's order on June 27, 2016, which was docketed by this Court on August 8, 2016. In his brief,[6] Mr. Wallace presents the following questions for this Court's review:

1. Did the [circuit court] err when it concluded that there was no reasonable probability that DNA testing of the black T-shirt would have produced exculpatory or mitigating evidence?

2. Did the [circuit court] abuse its discretion by denying [Mr. Wallace's] and the State's request to appoint counsel for [Mr. Wallace]?

**DISCUSSION**

*A.* ***The State's Duty to Preserve Scientific Identification Evidence***

---

[6] This Court assigned an attorney to represent Mr. Wallace on a *pro bono* basis for purposes of his appeal only.

10

Mr. Wallace argues that the circuit court erred in denying his Petition for a Postconviction DNA Hearing because the State had a duty, under the Postconviction DNA Testing Statute, to preserve the black t-shirt and accompanying hair fibers, but the State admitted that it had in fact destroyed the t-shirt. The State responds that it did not have a duty to preserve the t-shirt because it did not constitute "scientific identification evidence," as defined by the Statute. Therefore, the State concludes that the circuit court did not err in denying Mr. Wallace's petition for a hearing.

The Postconviction DNA Testing Statute imposes a duty on the State to preserve "scientific identification evidence":

(1) The State shall preserve scientific identification evidence that:

(i) the State has reason to know contains DNA material; and

(ii) is secured in connection with an offense described in subsection (b) of this section.

(2) The State shall preserve scientific identification evidence described in paragraph (1) of this subsection for the time of the sentence, including any consecutive sentence imposed in connection with the offense.

(3)    (i) If the State is unable to produce scientific identification evidence described in paragraph (1) of this subsection, the court shall hold a hearing to determine whether the failure to produce evidence was the result of intentional and willful destruction.

(ii) If the court determines at a hearing under subparagraph (i) of this paragraph that the failure to produce evidence was the result of intentional and willful destruction, the court shall:

1. order a postconviction hearing to be conducted in accordance with subparagraph (iii) of this paragraph; and

2. at the postconviction hearing infer that the results of the postconviction DNA testing would have been favorable to the petitioner.

11

* * *

CP § 8-201(j). The Statute defines "scientific identification evidence" as evidence that

> (i) is related to an investigation or prosecution that resulted in a judgment of conviction;

> (ii) is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and

> (iii) contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing.

CP § 8-201(a)(5). "Biological evidence," in turn, "includes, but is not limited to, any blood, hair, saliva, semen, epithelial cells, buccal cells, or other bodily substances from which genetic marker groupings may be obtained." CP § 8-201(a)(2).

Mr. Wallace argues that the State had a duty to preserve the black t-shirt and accompanying hair fibers because the State had reason to know the t-shirt contained DNA material by virtue of Corporal Harsh's mention of the hairs in his affidavit, and because the t-shirt was secured in connection with the State's investigation of Mr. Fetterhoff's murder. Because the State admitted to destroying the t-shirt, Mr. Wallace asserts that he is entitled to a postconviction hearing at which the court must infer that the results of DNA testing on the t-shirt would have been favorable to Mr. Wallace.

The State responds that it did not have a duty to preserve the black t-shirt and accompanying hair fibers because the t-shirt did not constitute "scientific identification evidence." Specifically, the State asserts that the t-shirt was not related to Mr. Fetterhoff's murder, *see* CP § 8-201(a)(5)(i), and that it did not "contain[] biological evidence from which DNA may [have been] recovered that may [have] produce[d] exculpatory or

12

mitigating evidence relevant to" Mr. Wallace's claim of wrongful conviction.[7] *See* CP §
8-201(a)(5)(iii). Additionally, the State argues that even if the black t-shirt did constitute
scientific identification evidence, the denial of Mr. Wallace's petition was nonetheless
harmless because there is no "favorable result" that could have come from DNA testing on
the t-shirt. Finally, the State notes that the circuit court did not make a determination as to
whether the State's failure to produce the t-shirt "was the result of intentional and willful
destruction." *See* CP § 8-201(j)(3)(i). Therefore, the State contends that if this Court were
to hold that the circuit court's decision was erroneous, and the error was not harmless, then
the appropriate relief for Mr. Wallace would be a remand for the circuit court to make that
determination.

In deciding whether the black t-shirt constituted "scientific identification evidence"
as defined by the Postconviction DNA Testing Statute, "[w]e give due regard to the
[circuit] court's role as fact-finder and will not set aside factual findings unless they are
clearly erroneous." *Phillips v. State*, 451 Md. 180, 189 (2017) (quoting *Bottini v. Dep't of
Fin.*, 450 Md. 177, 187 (2016)). However, when the circuit court's decision "involves an
interpretation and application of Maryland statutory and case law, our Court must
determine whether the [circuit] court's conclusions are legally correct under a *de novo*

---

[7] The State does not dispute that the black t-shirt satisfied the condition of CP § 8-201(a)(5)(ii), because it was "in the actual or constructive possession of a law enforcement agency," i.e. the Office of the State's Attorney for Washington County, when it was destroyed.

standard of review." *Blickenstaff v. State*, 393 Md. 680, 683 (2006) (quoting *Gray v. State*, 388 Md. 366, 375 (2005)).

First, we reject the State's contention that the black t-shirt and accompanying hair fibers were not "related to an investigation or prosecution that resulted in a judgment of conviction." CP § 8-201(a)(5)(i). Although the black t-shirt was not introduced at Mr. Wallace's trial, it was mentioned in Corporal Harsh's affidavit for a search and seizure warrant, examined for blood stains by the forensic chemist, and held in the Washington County Sheriff's Department's property room along with the other evidence. We hold that these factors are sufficient to conclude that the black t-shirt was "related to [the] investigation," if not the prosecution, of Mr. Fetterhoff's murder, which "resulted in a judgment of conviction" for Mr. Wallace. *See id.*

Next, we address whether the black t-shirt "contain[ed] biological evidence from which DNA may [have been] recovered that may [have] produce[d] exculpatory or mitigating evidence relevant to" Mr. Wallace's claim of wrongful conviction. *See* CP § 8-201(a)(5)(iii). In its memorandum opinion, the circuit court summarized the trial testimony of Ms. Russ, Ms. Stottlemeyer, and Mr. Kursey. These witnesses all indicated that Mr. Wallace was either wearing a white t-shirt with red stains on it, or was shirtless with a bloody white t-shirt wrapped around his hand, on the morning of Mr. Fetterhoff's murder. The circuit court also recounted that Mr. Wallace was wearing the black t-shirt and blue shorts when he was arrested later that evening for unrelated drug offenses. Finally, the court noted that investigators did not find any blood stains on the black t-shirt.

14

The circuit court concluded "that there is no reasonable probability that DNA testing of the black t-shirt would have produced exculpatory or mitigating evidence." The court found that Mr. Wallace had "utterly failed to show any connection between the black shirt he was wearing on the evening of August 20 and the murder that occurred earlier that day." The court then reiterated that "there is no reasonable possibility [sic] that DNA testing of the black shirt would produce exculpatory or mitigating evidence." On this basis, the circuit court denied Mr. Wallace's Petition for a Postconviction DNA Hearing.

It is apparent that the circuit court applied an incorrect legal standard in determining whether the black t-shirt constituted "scientific identification evidence" under the Postconviction DNA Testing Statute. The proper standard, as noted above, is whether the t-shirt "contain[ed] biological evidence from which DNA may [have been] recovered that may [have] produce[d] exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing." CP § 8-201(a)(5)(iii). Instead, the circuit court utilized the standard that governs when the court is required to order DNA testing on the requested evidence. On this distinct question, the Postconviction DNA Testing Statute provides that

a court shall order DNA testing if the court finds that:

(i) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing; and

(ii) the requested DNA test employs a method of testing generally accepted within the relevant scientific community.

15

CP § 8-201(d)(1). The circuit court quoted this provision of the Statute in its memorandum opinion, and referenced this language in its conclusions by stating that there was "no reasonable probability" and "no reasonable possibility" that DNA testing on the black t-shirt would have produced exculpatory or mitigating evidence for Mr. Wallace.

The threshold that a petitioner must satisfy in order to show that the State had a duty to preserve certain evidence under the Postconviction DNA Testing Statute is lower than the threshold that a petitioner must satisfy in order to be entitled to DNA testing on that evidence.[8] In other words, evidence that satisfies the "reasonable probability" standard of subsection (d), and is therefore subject to DNA testing, is a subcategory of evidence that satisfies the definition of "scientific identification evidence" in subsection (a), and is

---

[8] The Postconviction DNA Testing Statute contains yet another legal threshold that a petitioner must satisfy in order to be entitled to a new trial. If the petitioner moves for a new trial "on the grounds that the conviction was based on unreliable scientific evidence," then the court must determine whether "a **substantial possibility** exists that the petitioner would not have been convicted without the evidence." CP § 8-201(c) (emphasis added). Similarly, "[i]f the results of the postconviction DNA testing are favorable to the petitioner," then the court must find "that a **substantial possibility** exists that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial," before ordering a new trial. CP § 8-201(i)(2)(iii) (emphasis added).

Because this "substantial possibility" standard relates to whether the outcome of the petitioner's trial would have been different, it is a higher threshold than the "reasonable probability" standard, which relates only to whether the DNA testing has the potential to produce exculpatory or mitigating evidence, not what the effect of that evidence would have been at trial. *See Fuster*, 437 Md. at 671 (affirming circuit court's use of "substantial possibility" standard on petitioner's motion for new trial and use of "reasonable probability" standard on petitioner's request for DNA testing); *Gregg*, 409 Md. at 720 (In petition for DNA testing, petitioner "was not required to show that the outcome of his case necessarily would have been different, had the jury been presented with the evidence he seeks to obtain through the requested DNA testing.").

16

therefore subject to the State's duty of preservation. "Scientific identification evidence" includes all evidence that "contains biological evidence from which DNA **may be** recovered that **may produce** exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing." CP § 8-201(a)(5)(iii) (emphases added). In contrast, for the petitioner to be entitled to DNA testing of the evidence, there must exist a "**reasonable probability** . . . that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing." CP § 8-201(d)(1)(i) (emphasis added).

While this Court has not yet defined the term "reasonable probability" in the context of the Postconviction DNA Testing Statute, we thoroughly discussed the term and its implications in the distinct context of demonstrating when a certain property "is a reasonable probable source of lead exposure." *Rowhouses, Inc. v. Smith*, 446 Md. 611, 654 (2016). In that context, we held that, "for purposes of causation in lead-based paint cases at the summary judgment phase, a reasonable probability requires a showing that is less than 'more likely than not,' but more than a mere 'possibility.'" *Id.* at 655 (footnote omitted). After examining various definitions for the term "reasonable probability," we concluded "that a 'reasonable probability' is a fair likelihood that something is true." *Id.* at 657. We then examined various definitions for the term "possibility," and concluded that this means "a mere chance that something might be true, as opposed to a fair likelihood that something is true." *Id.* at 658. Therefore, "[e]stablishing a possibility requires a lower quantum of proof or evidence (the showing of a chance, not necessarily a fair likelihood)

17

than establishing a reasonable probability. In that regard, a 'reasonable probability' is a higher standard than a 'possibility.'" *Id.* at 658–59.

Thus, the relationship between the terms "possibility" and "reasonable probability" mirrors the relationship between the two standards for establishing what constitutes "scientific identification evidence" and what entitles a petitioner to DNA testing, respectively. Specifically, establishing that certain evidence meets the statutory definition of "scientific identification evidence" "requires a lower quantum of proof" than establishing that the petitioner is entitled to DNA testing on that evidence. Therefore, we deem it appropriate to employ the same definitions of these terms in the context of the Postconviction DNA Testing Statute.

Accordingly, we hold that the "may produce" language of CP § 8-201(a)(5)(iii) is equivalent to a "mere possibility" or "chance." In other words, "scientific identification evidence" is evidence that "contains biological evidence from which DNA **[could possibly be]** recovered that **[could possibly produce]** exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing." If there is any chance that the requested evidence could produce exculpatory or mitigating evidence (and it satisfies the other statutory requirements), then it is scientific identification evidence, which the State has a duty to preserve. Contrary to the language used by the circuit court, this "chance" or "mere possibility" need not rise to the level of a "reasonable probability" in order to establish that the State had a duty to preserve the evidence at issue.

18

Applying the correct legal standard to the circuit court's factual findings, we hold that the black t-shirt did not constitute "scientific identification evidence," as defined by the Statute. While recognizing that the "may produce" standard is a lower threshold than the "reasonable probability" standard employed by the circuit court, we nonetheless conclude that there was no possibility, or chance, that DNA testing on the black t-shirt could have produced exculpatory or mitigating evidence. This is because, as the circuit court found, it was never alleged that Mr. Wallace was wearing the black t-shirt when the murder occurred. Instead, multiple eyewitnesses stated that they saw Mr. Wallace on the morning of the murder either wearing a white t-shirt or shirtless with a bloody white shirt wrapped around his hand. At the hearing on his petition, Mr. Wallace acknowledged that he did not obtain the black t-shirt until after the murder "allegedly" occurred.

Mr. Wallace argued that DNA testing the hair fibers on the black t-shirt could have shown those hairs to match the ones found in Mr. Fetterhoff's abandoned car. While we acknowledge that this result is a statistical possibility, however unlikely, we do not see how such evidence, if it existed, could possibly qualify as "exculpatory or mitigating evidence relevant to [Mr. Wallace's] claim of wrongful conviction or sentencing." CP § 8-201(a)(5)(iii). At best, this result could indicate that there was another individual with hair "of Negroid origin" in Mr. Fetterhoff's car at some unknown time, and that that individual also came into contact with Mr. Wallace's black t-shirt at some other unknown time. Again, we are unable to see how this result could *possibly* qualify as "exculpatory or mitigating evidence" for Mr. Wallace.

19

Therefore, we conclude that the black t-shirt and accompanying hair fibers did not satisfy condition (iii) in the statutory definition of "scientific identification evidence." *See* CP § 8-201(a)(5). Because the t-shirt did not constitute "scientific identification evidence" as defined by the Statute, the State did not have a duty to preserve it, and Mr. Wallace was not entitled to a hearing to determine whether the State's failure to produce the t-shirt "was the result of intentional and willful destruction." *See* CP § 8-201(j)(3)(i). Accordingly, we affirm the circuit court's denial of Mr. Wallace's Petition for a Postconviction DNA Hearing.

**B.** ***The Circuit Court's Denial of Appointed Counsel for Mr. Wallace***

Next, Mr. Wallace argues that the circuit court abused its discretion in declining to appoint counsel to represent him at the postconviction hearing. Mr. Wallace recognizes that under *Fuster*, there is no right to appointed counsel for purposes of a petition under CP § 8-201. *See Fuster*, 437 Md. at 669. However, Mr. Wallace asserts that *Fuster* was wrongly decided and should be overruled. The State responds that Mr. Wallace waived this argument, and it is nonetheless without merit. Additionally, the State asserts that the circuit court did not abuse its discretion in denying Mr. Wallace's "post-hoc request for appointment of counsel," because it was reasonable for the court to deny the request in this case.

At the time when Mr. Wallace filed his petition and when the circuit court declined to appoint him counsel (in response to both the State's request and Mr. Wallace's belated request), Maryland Rule 4-707(b) provided,

20

> If the court finds that a petitioner who has requested the appointment of counsel is indigent, the court **shall** appoint counsel within 30 days after the State has filed its answer unless (1) the court denies the petition as a matter of law or (2) counsel has already filed an appearance to represent the petitioner.

Md. Rule 4-707(b) (2009) (amended 2015) (emphasis added).[9] Despite the use of mandatory language ("shall") in the Rule, this Court held in *Fuster* that there is never "any circumstance under which a trial court **must**, or shall, appoint counsel for an indigent petitioner for purposes of a petition under CP § 8-201." 437 Md. at 669. Instead, we reiterated "that the appointment of counsel for purposes of a petition under CP § 8-201 is **discretionary**," and "a trial court may appoint counsel to represent a petitioner when the [trial] court believes [that] counsel would be necessary to further the interest of justice." *Id.* at 667, 668 (alterations in original) (internal quotation marks omitted) (citing *Simms v. State*, 409 Md. 722, 726 n.5 (2009) ("*Simms I*"); *Arey v. State*, 400 Md. 491, 509 (2007)). Accordingly, we held that we review the circuit "court's decision as to whether to appoint counsel for an indigent petitioner for purposes of a petition under CP § 8-201" for abuse of discretion. *Id.* at 669.

Furthermore, we determined in *Fuster* that appointment of counsel pursuant to the Rule was premised upon the petitioner's *request* for appointed counsel in the petition. *Id.* at 670. Therefore, we held, "A trial court does not abuse its discretion in not choosing whether to exercise the discretion to appoint counsel for a petitioner for purposes of a

---

[9] Maryland Rule 4-701 provides that the "Rules in this Chapter apply to proceedings filed under Code, Criminal Procedure Article, § 8-201."

petition under CP § 8-201 where the petitioner does not request appointment of counsel in the petition." *Id.*

Following our decision in *Fuster*, the Standing Committee on Rules of Practice and Procedure amended Rule 4-707(b) to reflect our holding that the appointment of counsel for purposes of a petition under CP § 8-201 is discretionary rather than mandatory, and this Court adopted the amended Rule on December 7, 2015. *Simms v. State*, 445 Md. 163, 183 n.16 (2015) ("*Simms II*"). Effective January 1, 2016, the Rule now provides,

> If the court finds that a petitioner who has requested the appointment of counsel is indigent, the court **may** appoint counsel within 30 days after the State has filed its answer unless (1) the court denies the petition as a matter of law or (2) counsel has already filed an appearance to represent the petitioner.

Md. Rule 4-707(b) (2016) (emphasis added). Thus, both the Rule and our precedents make it abundantly clear that an indigent petitioner under CP § 8-201 has no right to appointed counsel. Instead, the decision whether to appoint counsel for purposes of a petition under CP § 8-201 lies within the sound discretion of the circuit court, which must consider whether the appointment of counsel is necessary to further the interest of justice. *Fuster*, 437 Md. at 668.

Mr. Wallace does not dispute that this is the law. Instead, Mr. Wallace asserts that the holding of *Fuster* is contrary to "the concept of fundamental fairness" because it will often require "a generally uneducated person living in a penal institution" to "argue against an educated and skilled prosecutor" on the complex and highly technical subject of DNA in order to achieve his freedom. Therefore, Mr. Wallace urges this Court to overrule our

22

holding in *Fuster*, and hold that indigent petitioners under CP § 8-201 are entitled to appointed counsel.

The State responds that Mr. Wallace waived this argument by failing to request appointed counsel in his petition, and by telling the circuit court at the hearing that he was prepared to proceed *pro se*. Furthermore, the State asserts that if the Court does consider Mr. Wallace's claim of error, there is no basis to overrule *Fuster*. The State contends that a defendant is only entitled to postconviction DNA review by virtue of the Statute, and therefore any entitlement to be represented by counsel at a postconviction DNA hearing must also be statutory. Thus, the State concludes, unless the legislature amends CP § 8-201 to provide a statutory right to counsel, there is no such right for postconviction DNA hearings.

We disagree with the State's contention that Mr. Wallace waived his argument regarding the correctness of our holding in *Fuster*. It is true that Mr. Wallace did not request appointed counsel in his original petition or in his amended petition. Under *Fuster*, Mr. Wallace's failure to request counsel means that the circuit court was not required to exercise its discretion to determine whether the appointment of counsel was necessary to further the interest of justice. 437 Md. at 670. But this holding is precisely what Mr. Wallace now challenges—whether the circuit court was required, by "the concept of fundamental fairness," to appoint him counsel despite his failure to request it. To hold that Mr. Wallace waived this argument by failing to make the request would effectively affirm our holding in *Fuster*—that the request is required to trigger the circuit court's exercise of discretion—without substantively examining the correctness of that holding. Moreover,

23

we note that the petitioner in *Fuster* also did not request appointed counsel in his petition, yet we did not deem this to be a waiver of his argument regarding the right to counsel.

Additionally, we disagree with the State's contention that Mr. Wallace waived this argument by informing the circuit court at the hearing on May 4, 2016 that he was prepared to proceed *pro se*. Mr. Wallace informed the court at the start of this hearing that he had been attempting to secure counsel to represent him, but his efforts had been unsuccessful. It is in this context that Mr. Wallace told the court that he was ready to proceed on his own. This exchange makes clear that Mr. Wallace was still hoping to be represented by counsel at the time of the hearing, and only agreed to represent himself when that became his only option. Under these circumstances, and considering that Mr. Wallace did file a belated request for appointed counsel after the circuit court ruled that he was not entitled to such counsel, we hold that Mr. Wallace has not waived his argument regarding the right to be represented by counsel for purposes of a petition under CP § 8-201.

We turn now to Mr. Wallace's argument that we should overrule our holding in *Fuster*. "Under *stare decisis*, absent 'extremely narrow' exceptions, an appellate court does not overrule its precedent." *Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 57 (2015) (citing *DRD Pool Serv., Inc. v. Freed*, 416 Md. 46, 63 (2010)). "*Stare decisis* 'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *Id.* at 58 (quoting *DRD Pool Serv., Inc.*, 416 Md. at 63). Still, this Court has recognized two "extremely narrow" circumstances under which it would be appropriate to overrule our own precedent. *DRD Pool Serv., Inc.*, 416 Md. at 63–64. First, the "Court

24

may strike down a decision that is, 'clearly wrong and contrary to established principles.'" *Id.* at 64 (quoting *State v. Adams*, 406 Md. 240, 259 (2008)). "Second, precedent may be overruled when there is a showing that the precedent has been superseded by significant changes in the law or facts." *Id.*; *see also Thompson*, 443 Md. at 58 ("An appellate court need not adhere to *stare decisis* where 'changed conditions or increased knowledge' have rendered the appellate court's precedent 'unsound in the circumstances of modern life, a vestige of the past, [and] no longer suitable to [the] people.'" (alterations in original) (quoting *DRD Pool Serv., Inc.*, 416 Md. at 64)).

While Mr. Wallace does not specify which of these exceptions he claims to be applicable to *Fuster*, we infer from his argument regarding "fundamental fairness" that Mr. Wallace believes *Fuster* to be "clearly wrong and contrary to established principles." Regardless of his position, we hold that the second exception to *stare decisis*—"that the precedent has been superseded by significant changes in the law or facts"—is inapplicable here. Certainly, it cannot be said that *Fuster*, which we decided just three years ago, has become "unsound in the circumstances of modern life, a vestige of the past, [or] no longer suitable to [the] people." *DRD Pool Serv., Inc.*, 416 Md. at 64. Additionally, Mr. Wallace does not point us to any "significant changes in the law or facts" that may have "superseded" our holding in *Fuster*, *see id.*, nor are we aware of any such significant changes. To the contrary, we note that this Court has since reaffirmed our holding in *Fuster*. *See Simms II*, 445 Md. at 183 ("Although [Rule 4-707(b)] uses the phrase 'shall appoint,' this Court has held that a circuit court's decision whether to appoint counsel is discretionary." (citing *Fuster*, 437 Md. at 664–69)). Thus, having eliminated the second

25

exception to *stare decisis*, we must determine whether *Fuster* is "clearly wrong and contrary to established principles," such that it would be appropriate for us to overrule our own precedent. *See DRD Pool Serv., Inc.*, 416 Md. at 64.

We first examined whether indigent petitioners have a right to appointed counsel under CP § 8-201 in *Blake v. State*. There, we noted that "[t]here is no federal constitutional right to counsel in a postconviction collateral attack on a criminal conviction," nor is there such a right under the Maryland Constitution. *Blake*, 395 Md. at 234–35. Therefore, we determined that "[a]ny right to counsel . . . under the DNA testing statute must be found in [CP] § 8-201." *Id.* at 235. We then examined the Public Defender Act and the Uniform Post Conviction Procedure Act, and held that neither one created "a statutory right to appointed counsel for proceedings under [CP] § 8-201." *Id.* at 237. We noted that the Public Defender Act includes a provision requiring the appointment of counsel "in postconviction proceedings 'when the defendant has a right to counsel pursuant to Title 7 of the Criminal Procedure.'" *Id.* "The right to file a petition for postconviction DNA testing, however, is granted by § 8-201(b), located in Title 8 of the Criminal Procedure Article, not Title 7." *Id.* Therefore, we concluded that there was neither a constitutional nor a statutory right to appointed counsel under CP § 8-201. *Id.*

We returned to this issue in *Arey v. State*, where we held that "[t]here is no right to appointed counsel under [CP] § 8-201, either statutory or constitutional, to assist a person in filing a petition under the [S]tatute or during the initial stages of the proceedings." 400 Md. at 507 (citing *Blake*, 395 Md. at 234–38). We further explained "that under [CP] § 8-201, a petitioner has no absolute statutory right to assistance from counsel unless and until

26

the petitioner receives favorable DNA testing results, and has not opened a postconviction hearing previously." *Id.* at 508. However, we also noted "that although there is no constitutional or statutory right to counsel at the time a petitioner files the petition for DNA testing, a court has the inherent power to appoint counsel at any stage of proceedings under [CP] § 8-201" when the appointment is necessary to further the interest of justice. *Id.* at 508–09.

Later, in *Simms I*, we reiterated our holding from *Arey*:

> "There is no right to appointed counsel under [CP] § 8–201, either statutory or constitutional, to assist a person in filing a petition under the statute or during the initial stages of the proceedings." *Arey v. State*, 400 Md. 491, 507 (2007) (citing [CP] § 8–201(h)(2)). A court nevertheless "has the inherent power to appoint counsel at any stage of proceedings under [CP] § 8–201." *Id.* at 508. Consequently, the court may "appoint counsel to represent a petitioner when the court believes counsel would be necessary to further the interest of justice." *Id.* at 509.

*Simms I*, 409 Md. at 726 n.5.

Approximately one and a half months after issuing our decision in *Simms I*, this Court adopted Rule 4-707(b) on September 10, 2009. A committee note to Rule 4-704(a), adopted concurrently with Rule 4-707(b), indicated that the Court's purpose in adopting the Rule was to implement our holdings in *Arey* and *Simms I*:

> A petition filed by an unrepresented petitioner may be lacking in some of the details required by subsections (a)(2) and (a)(3) of this Rule. To justify an order requiring DNA testing or a search of law enforcement databases or logs, however, those details must be provided at some point. **That may be achieved by the appointment of counsel under Rule 4-707** and an appropriate amendment to the petition.

(Emphasis added.) Based on the timing of the Rule, the committee note that accompanies it, and our holdings in *Arey* and *Simms I*, we held in *Fuster* that "Rule 4-707(b) does not

27

entitle an indigent petitioner to counsel for purposes of a petition under CP § 8-201; instead a trial 'court may "appoint counsel to represent a petitioner when the [trial] court believes [that] counsel would be necessary to further the interest of justice."'" 437 Md. at 668 (alterations in original) (quoting *Simms I*, 409 Md. at 726 n.5 (quoting *Arey*, 400 Md. at 509)).

Thus, it is apparent that our decision in *Fuster* was premised upon our earlier holdings in *Arey* and *Simms I*, which in turn drew upon *Blake*, where we first examined whether there is a right to counsel for purposes of a petition under CP § 8-201. Based upon our independent review of these earlier cases, and of our analysis of those cases and Rule 4-707(b) in *Fuster*, we conclude that *Fuster* is not "clearly wrong."

Nor do we believe that our holding in *Fuster* is "contrary to established principles." While we acknowledge the potential difficulties for indigent petitioners representing themselves for purposes of a petition under CP § 8-201, we reiterate that the right to postconviction DNA review is purely statutory, and therefore any right to appointed counsel in those proceedings must also be statutory. *See Blake*, 395 Md. at 235 ("Any right to counsel appellant may have under the DNA testing statute must be found in [CP] § 8-201."). Moreover, we note that Mr. Wallace's argument—that being required to represent himself against a skilled and trained prosecutor on the complex and highly technical subject of DNA is contrary to "the concept of fundamental fairness"—is the same argument we considered and rejected in *Blake*. *See id.* ("[Mr. Blake's] sole argument is that as an indigent, he is entitled to the appointment of counsel because of the scientific complexity of DNA evidence analysis and that the legal procedures authorized by [CP] § 8-201 are too

28

difficult for a layman to navigate successfully."). Additionally, the circuit court retains the discretion to appoint counsel for indigent petitioners when it believes the appointment is necessary to further the interest of justice, which serves to alleviate some of these concerns on a case-by-case basis. "However appealing [these] arguments are from a policy perspective, they are unavailing with respect to the issue of statutory construction before us." *Id.* at 237. As such, Mr. Wallace's "remedy is with the Legislature, not with this Court." *Id.* at 238.

We therefore conclude that neither of the two "extremely narrow" exceptions to *stare decisis* applies to our holding in *Fuster*. Accordingly, we decline Mr. Wallace's invitation to overrule our own precedent. Instead, we hold that *Fuster* was correctly decided and remains binding on this Court.

Finally, we consider Mr. Wallace's argument that the circuit court abused its discretion in declining to appoint counsel to represent him at the hearing on his petition. Beyond arguing that *Fuster* was wrongly decided and that every indigent petitioner is entitled to appointed counsel at a hearing under CP § 8-201, Mr. Wallace does not explain how the circuit court's denial of his request constituted an abuse of discretion in this particular case. The State asserts that the circuit court's decision was not an abuse of discretion because, "given the nature of [Mr.] Wallace's claim, there is no possibility that the appointment of counsel would have altered the outcome of the case, let alone that it was in the 'interests of justice'" to do so.

Whether to appoint counsel for purposes of a petition under CP § 8-201 lies within the sound discretion of the circuit court, which must consider whether the appointment of

counsel is "necessary to further the interest of justice." *Fuster*, 437 Md. at 668 (quoting

*Simms I*, 409 Md. at 726 n.5). Accordingly, we will not reverse the decision of the circuit

court unless it abused its discretion. *Id.* at 669.

> An abuse of discretion occurs where no reasonable person would take
> the view adopted by the trial court, or when the court acts without reference
> to any guiding principles or rules, or when the ruling under consideration is
> clearly against the logic and effect of facts and inferences before the court or
> when the ruling is violative of fact and logic. Generally, the standard is that
> absent a showing that a court acted in a harsh, unjust, capricious and arbitrary
> way, this Court will not find an abuse of discretion.

*Md. Bd. of Physicians v. Geier*, --- Md. ---, --- (2017) (brackets, internal quotation marks,

and citations omitted).

Here, Mr. Wallace did not request appointed counsel in either his petition or his

amended petition, but the State indicated at the initial hearing on December 4, 2014 that

the court would be required to appoint counsel for Mr. Wallace for further proceedings.

Despite Mr. Wallace's failure to formally request counsel at the appropriate time, the

circuit court nonetheless considered the State's suggestion, and correctly determined that

the decision whether to appoint counsel for Mr. Wallace was within the court's discretion.

The circuit court then concluded, based on the fact that Mr. Wallace had previously

litigated a postconviction proceeding—represented by counsel—and the court's perception

of Mr. Wallace's potential for success on his petition, that appointment of counsel was not

necessary to further the interest of justice. When Mr. Wallace subsequently submitted a

formal request for appointed counsel, the circuit court summarily denied it.

The court did not act "without reference to any guiding principles or rules"; instead,

it appropriately considered whether appointed counsel was necessary to further the interest

30

of justice. The circuit court's conclusion is not unreasonable, nor "clearly against the logic and effect of facts and inferences before the court," nor "violative of fact and logic." Furthermore, the circuit court did not act "in a harsh, unjust, capricious, or arbitrary way." Instead, the court carefully considered the State's suggestion for appointed counsel, even though not required to do so by virtue of Mr. Wallace's failure to request it in his petition. Therefore, we hold that the circuit court did not abuse its discretion in declining to appoint counsel to represent Mr. Wallace for purposes of a petition under CP § 8-201.

## CONCLUSION

The circuit court did not err in denying Mr. Wallace's Petition for a Postconviction DNA Hearing to determine whether the State's failure to produce the black t-shirt "was the result of intentional and willful destruction" under CP § 8-201(j)(3)(i). The black t-shirt did not satisfy the statutory definition of "scientific identification evidence," and therefore the State did not have a duty to preserve it. Therefore, Mr. Wallace was not entitled to a hearing under CP § 8-201(j)(3)(i). Additionally, we decline Mr. Wallace's request to overrule our holding in *Fuster*, and reaffirm that the appointment of counsel for purposes of a petition under CP § 8-201 is discretionary, not mandatory. In this case, the circuit court did not abuse its discretion in declining to appoint counsel for Mr. Wallace. Therefore, we affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

31